UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

FILED

01 AUG 14  PM 3: 00

CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE, FLORIDA

GERALINE FELTON and REGINA ADAMS,                )
as the CO-GUARDIANS of LARRY HARVEY, JR.,        )
                                                 )
        Plaintiffs,                              )
                                                 )
vs.                                              ) Case No.: 3.01-cv-934-J 20C
                                                 )
JOHN RICHARD AMMAN individually and in his official )
capacity; CHARLOTTE BALLARD individually and in her )
official capacity; VICKI MARIE MULLINS LOVETT    )
individually and in her official capacity; KAREN A. OTIS,LPN )
individually and in her official capacity; ST. JOHNS COUNTY )
SHERIFF'S DEPARTMENT;SHERIFF NEIL J. PERRY       )
 individually and as Sheriff of St. Johns County; )
CHRISTOPHER E. BARNES individually and in his official )
capacity; KEITH T. BARBER individually and his official )
capacity; CAROL RISDEN, LPN individually and in her official )
capacity; ANN E. DOHNER WARDEN, RN individually and in )
her official capacity; DR. STANLEY A. COHEN individually )
and in his official capacity; DR. MICHAEL TESSLER )
individually and in his official capacity; and ST. JOHNS )
COUNTY MENTAL HEALTH DEPARTMENT,                 )
                                                 )
        Defendants.                              )

PLAINTIFFS' COMPLAINT AND
DEMAND FOR JURY TRIAL

PLAINTIFFS', GERALINE FELTON and REGINA ADAMS, as CO-

GUARDIANS OF LARRY HARVEY, JR. (hereinafter referred to as "PLAINTIFFS"),

sue DEFENDANTS: John Richard Amman; Charlotte Ballard; Vicki Marie Mullins Lovett;

Karen A. Otis (LPN); St. Johns County Sheriff's Department; Carol Risden (LPN); Ann E.

Dohner Warden (RN); Dr. Stanley A. Cohen; Dr. Michael Tessler; St. Johns County Mental

Health Department; Sheriff Neil J. Perry; Deputy Christopher E. Barnes; and Deputy Keith

T. Barber, and in support thereof states the following:

## JURISDICTION AND VENUE

1.  This action arises under and is brought pursuant to 42 U.S.C. § 1983 to remedy

the deprivation, under color of state law, of rights guaranteed by the Eighth and Fourteenth

Amendments to the United States Constitution.

2.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 and

supplemental jurisdiction over state claims pursuant to 28 U.S.C. §1367.

3.  This cause of action arose in the Middle District of Florida.  Therefore, venue is

proper under 28 U.S.C. §1391(b).

## THE PARTIES

4.  Geraline Felton is an adult citizen and resident of St. Johns County, Florida,

and the mother of Larry Harvey, Jr.

5.  Regina Adams is an adult citizen and resident of Georgia and the sister of

Larry Harvey, Jr.

6.  Larry Harvey, Jr., is an adult citizen of the United States and a resident of St.

Johns County in the State of Florida.  Throughout the relevant time period, Larry Harvey,

Jr., (Larry Harvey) was an inmate at the St. Johns County Detention Center and/or the St.

Johns County Jail in St. Augustine, Florida.

7.  On December 26th, 1998, Larry Harvey was found unconscious in his cell

while incarcerated at the St. Johns County Jail.  He has remained in a vegetative state

2

ever since and currently resides in a long term care facility in St. Augustine, Florida, in St. Johns County.

    8.  On January 19, 2000, PLAINTIFFS were appointed plenary GUARDIANS OF LARRY HARVEY, JR., and have been granted the authority to bring this action on behalf of Larry Harvey, Jr. A copy of the Letters of Guardianship is attached as (Exhibit "A").

    9.  Defendant NEIL J. PERRY (SHERIFF) is the Sheriff of St. Johns County, and on information and belief, was at all times material to this action an adult citizen and resident of St. Johns County Florida, and responsible for the conduct of the employees and agents of the St. Johns County Corrections Division for the operation of the St. Johns County Jail or Correctional facility, for establishing customs, policies, and procedures to regulate the conduct of agents and employees of the St. Johns County Corrections Division, and for ensuring that employees and agents of the St. Johns County Corrections Division obeyed the laws of the State of Florida and the United States.

    10. Defendant ST. JOHNS COUNTY SHERIFF'S DEPARTMENT (the JAIL) is a division of the St. Johns County government, and is operated by the SHERIFF, and, as such, falls under the auspices, control and responsibility of the SHERIFF, and includes responsibility for the St. Johns County Jail.

    11. Defendant CHRISTOPHER E. BARNES (BARNES), at all times material to this action, was an adult citizen and resident of St. Johns County, Florida, and employed as a correctional officer by the St. Johns County Sheriff's Department and/or the St. Johns County Jail.

3

12. Defendant KEITH T. BARBER (BARBER), at all times material to this action, was an adult citizen and resident of St. Johns County, Florida, and employed as a correctional officer by the St. Johns County Sheriff's Department and/or the St. Johns County Jail.

13. Defendant CHARLOTTE BALLARD (BALLARD), at all times material to this action, was an adult citizen and resident of St. Johns County, Florida, and employed by the St. Johns County Sheriff's Department as a licensed practical nurse to provide medical care to inmates at the St. Johns County Jail.

14. Defendant VICKI MARIE MULLINS LOVETT (LOVETT), at all times material to this action, was an adult citizen and resident of St. Johns County, Florida, and employed by the St. Johns County Sheriff's Department as a licensed practical nurse to provide medical care to inmates at the St. Johns County Jail.

15. Defendant CAROL RISDEN (RISDEN), at all times material to this action, was an adult citizen and resident of St. Johns County, Florida, and employed by the St. Johns County Sheriff's Department as a licensed practical nurse to provide medical care to inmates at the St. Johns County Jail.

16. Defendant KAREN A. OTIS (OTIS), at all times material to this action, was an adult citizen and resident of St. Johns County, Florida, and employed by the St. Johns County Sheriff's Department as a licensed practical nurse to provide medical care to inmates at the St. Johns County Jail.

17. Defendant JOHN RICHARD AMMAN (AMMAN), at all times material to this action, was an adult citizen and resident of St. Johns County, Florida, and employed

4

by the St. Johns County Sheriff's Department as a licensed practical nurse to provide medical care to inmates at the St. Johns County Jail.

18. Defendant DR. STANLEY A. COHEN (COHEN) is a doctor of osteopathy, licensed in the State of Florida, and a resident of St. Johns County, Florida, who at all times material to this action was providing medical services on behalf of the JAIL, while employed with the St. Johns County Mental Health Department (SJCMHD).

19. Defendant SJCMHD is a division of the St. Johns County Government and the employer of Defendant COHEN.

20. Defendant MICHAEL TESSLER (TESSLER) is a medical doctor licensed in the State of Florida, and a resident of St. Johns County, Florida, who at all times material to this action was performing services on behalf of the JAIL, and on information and belief was under contract to consult, plan and provide medical services and assistance to the St. Johns County Department of Corrections including the JAIL. Dr. Tessler, pursuant to the St. Johns County Department of Corrections Policies and Procedures is responsible for the overall level of health care services rendered at the JAIL to its inmates.

21. Defendant ANN E. DOHNER WARDEN, R.N., (WARDEN) is an employee of the St. Johns County Department of Corrections, who at all relevant times hereto, served as the Nursing Service Director at the St. Johns County Jail. As Nursing Services Supervisor, WARDEN, supervises the nursing service at the St. Johns County Jail, establishes policies and procedures for the St. Johns County Department of Corrections, provides hand-on nursing care in complex cases and makes fiscal management decisions

regarding medical care at the St. Johns County Jail. At all times material hereto, WARDEN participated in the treatment and management of Larry Harvey's medical care. WARDEN was responsible for providing competent medical treatment to inmates at the St. Johns County Jail.

## ALLEGATIONS OF FACT

22. On or about September 28th, 1998, Larry Harvey, Jr., was placed into the St. Johns County Jail. Shortly after his admission, Defendant COHEN by telephone order, instructed that Mr. Harvey be placed on anti-psychotic medication, to wit, Haldol 5 mg Elixir two times a day along with Cogentin .5 mg every morning and 2 mg at night.

23. After experiencing adverse affects from the medication, Mr. Harvey refused several doses of his medication on October 1st through October 3rd, informing the nursing staff of his adverse side effects.

24. Shortly thereafter, on or about October 6th, Defendant COHEN changed Mr. Harvey's Haldol from the 5 mg two times a day dose to Haldol Deconate100mg IM injection per month.

25. Defendant WARDEN agreed with the recommendation to change the Haldol to a long acting sustained release form of the medication.

26. Mr. Harvey received the first dose of this long acting sustained release preparation on the morning of October 7th. At that time, Mr. Harvey's Cogentin medication was changed to an as needed basis.

27. On October 9th, Defendant COHEN purportedly changed the Cogentin dose back to 2mg at night to treat the side effects from the previously given Haldol.   Mr. Harvey received sporadic doses of the Cogentin after this change in the order.

28. Defendant COHEN notes indicate that he first saw Mr. Harvey on October 14th or 15th, 1998,

29. Inconsistent with the Medication Administration Record (MAR) of what medications were given, Defendant COHEN'S October 15th notes indicate that the Haldol 10 mg every night was to continue, (along with Cogentin 2mg at night) even though Mr. Harvey had previously been given Haldol Deconate 100mg on October 7th.

30. After the October 7th, change to the dose of 100mg long acting Haldol injection, Mr. Harvey began to experience marked sedation and extrapyramidal symptoms and experienced fainting.  He was evaluated by Defendant TESSLER on October 9th and placed on medical watch at that time.  An EKG conducted on October 14th indicated an abnormal change suggestive of inferior lateral left ventricular ischemia.

31. Mr. Harvey's lethargy continued and on October 17th he was found unresponsive on the floor of his cell and "would" not speak or get up.  On October 20th, Defendant COHEN changed his PRN Cogentin to 2 mg BID (twice a day) after a 2 mg IM dose was given immediately.

32. Again, inconsistent with the MAR and Inmate progress notes for that date, Defendant COHEN'S October 20th notes indicate that he was reducing the Haldol dose to 7.5 mg every night at bedtime, and increasing the Cogentin to 3 mg at bedtime.

33. On November 3rd, Defendant COHEN'S saw Mr. Harvey and noted the extrapyramidal symptoms including choreiform tongue movements and lip tremors. Consequently, Defendant COHEN ordered the Haldol Deconate (long acting sustained release) injection dosing reduced to 75 mg IM per month starting on November 9th and continued the Cogentin 2 mg orally two times a day. He also noted Mr. Harvey's inability to sleep and prescribed trazodone 75 every night.

34. According to the Inmate Progress Notes, On November 9th, Defendant AMMANS gave Mr. Harvey a 100 mg dose of the Haldol Deconate, contrary and inconsistent to the MAR instructions and notation for that date and a previous order of a dose of 75 mg of the Haldol Deconate. Following this dose, Mr. Harvey endured the adverse effects and extrapyramidal symptoms from the medication up through November 20th when the records indicate that Mr. Harvey himself made a written request to have his medication adjusted.

35. Defendant COHEN saw Mr. Harvey again on December 1, 1998, and noted the continuing extrapyramidal symptoms. Mr. Harvey complained about the effects of the long acting medication and requested that he not be forced to take it. At that time, Defendant COHEN changed Mr. Harvey's medication from Haldol Deconate to Haldol 10 mg tablets every night along with Cogentin 2 mg tablets twice a day and trazodone 75 mg every night. The Haldol 10 mg dose was begun on December 1st.

36. On December 5th, Mr. Harvey did not take the nighttime dose of Cogentin, Haldol and trazodone. Although Mr. Harvey the medications the following evening (December 6th), as indicated by the MAR, Defendant COHEN was notified of Mr.

8

Harvey's missed December 5th doses and telephoned in an order to discontinue all of Mr. Harvey's medications.

37. At that point, Mr. Harvey had received 5 doses of 10 mg Haldol in December combined with the remaining November 9th 100 mg injection of Haldol Deconate that was still being released in Mr. Harvey's system. After the morning of December 7th, Mr. Harvey was not receiving any further Cogentin to counter the effects of the Haldol still in his system and received no further additional medication until December 15th.

38. On December 10th, Mr. Harvey was found passed out on the floor of his cell and was moved to "Sick Cell" 27 4-A for observation late on December 10th. He was noted to have eaten very little of his breakfast on December 11th and was very unstable on his feet. Later on in the morning of December 11th he was moved back to isolation.

39. On December 13th, Mr. Harvey did not eat his lunch, and it was noted that when he was released from his restraints temporarily, he was very unstable, falling backwards and almost hitting his head on the door jamb. He was observed to have been incontinent and was placed into the shower and given clean boxer shorts to put on before being placed back in his arm and leg restraints in his cell. He was noted at this time (10:50 PM on December 13th) to be very unresponsive.

40. On December 14th, it was noted that Mr. Harvey did not eat his lunch and that he "refused to get up."

41. On December 15th, it was noted that Mr. Harvey was taking some fluids at that time, but that he was having trouble eating.

42. On December 15th Defendant TESSLER ordered Mr. Harvey to be moved to a "Sick Cell" for closer observation and to force fluids and place him on a soft diet, consistent with the witness reports that Mr. Harvey was unable to eat or drink or take care of himself.

43. Also on December 15th, Defendant COHEN phoned in an order to restart Mr. Harvey's Haldol, to be given by intramuscular injection at a dose of 10 mg immediately and two times a day, a dose twice that of any previously recorded daily dosing for Mr. Harvey. Additionally, Defendant COHEN ordered an injection of Haldol Deconate 75 mg to be given immediately along with a 10 mg injection of Cogentin.

44. On December 16th, an EKG was performed and showed abnormalities suggestive of possible anteriolateral ventricular ischemia and inferior ventricular ischemia. Mr. Harvey's heart rate was found to be markedly elevated consistently throughout December 15th and 16th as well. Additionally, the Progress Notes indicate that Mr. Harvey required assistance on December 17th to go to the toilet, and that he appeared weak.

45. The twice a day Cogentin 2 mg injections and Haldol 10 mg (2 per day) injections continued through December 22nd, at which time all medications were stopped, including the Cogentin. By December 22nd, Mr. Harvey had received a total of 15 injections of 10 mg of Haldol (150 mg) in addition to the 75 mg of the slow release Haldol Deconate.

46. On December 20th, Mr. Harvey was moved back to his isolation cell (Block 15, cell 3A) for the last time. His Haldol daily injections stopped on December 22.

47. From December 22nd through December 26th, the records are practically void of any indication that Mr. Harvey was being medically monitored for adverse reactions to Haldol in his system.

48. The Inmate Condition Check reports for December 22nd and 23rd indicate that Mr. Harvey had made a request for medical attention, and that the medical staff was advised of his request. There is no indication in the available records that Mr. Harvey received any response to these documented requests for medical attention on December 22nd, 23rd, or 24th.

49. On December 25th, the Inmate Condition Check report indicates that Mr. Harvey's condition was so debilitated that he had to have assistance to lie down on his bed, after being given some milk. He had no breakfast.

50. Mr. Harvey was given a single dose of Cogentin 2 mg IM on December 25th after Nurse Amman observed him in a withdrawn state, sweating, with hand retractions.

51. The Inmate Condition Check reports for December 20th through December 26th indicated that Mr. Harvey showed virtually no activity at all. He was merely seen lying on his bed almost the entire time from December 20th through December 26th.

52. At about 12:30 PM on December 26th, Mr. Harvey was observed by jail staff kneeling over and beside his bed and on the floor and was found about 4 hours later in the same position, unconscious, and without respiration or pulse.

## STATEMENT OF CASE

53. On or about September 28th, 1998, Larry Harvey, Jr., was arrested and placed in the St. Johns County Detention Center (the JAIL). On December 26, 1998, at about

4:00 PM in the afternoon, Larry Harvey, Jr., was found in his isolation cell, kneeling over

his bed at the St. Johns County Detention Center, in St. Augustine, Florida.  He was not

breathing at the time and had no heartbeat.  Resuscitation was started and Mr. Harvey's

heart was eventually restarted, but he was found to have no brain activity.

54. On December 26th, 2000, Plaintiffs filed an extension of the Limitation of

Action for Medical Malpractice pursuant to F.S.A. § 766.104(2), in the United States

Federal District Court for the Middle District of Florida and in the St. Johns County

Circuit Court, granting an automatic 90 day extension of the Statute of Limitation to

conduct further investigation of this claim (Exhibit B attached hereto).

55. Based upon the pre-suit investigation conducted in this matter and the

corroborating medical, a reasonable basis was established to support a claim for medical

malpractice with regards to the medical treatment provided to Larry Harvey while he was

incarcerated at the St. Johns County Jail, in St. Augustine, Florida, from late September

through December 26th, 1998.

56. On March 26, 2001, Plaintiffs served the following defendants by certified

mail, return receipt requested, with their Notice of Intent to Initiate Litigation for Medical

Malpractice pursuant to F.S 766.106 (Exhibit C attached hereto):

    a.   Michael Tessler, M.D. (Rejection of claim received June 25th);

    b.   Stanley A. Cohen, D.O. (Rejection of claim received on June 18th);

    c.   Charlotte Ballard, LPN (Rejection by lapse of 90 day response period);

    d.   Vicki Mullins Lovett, LPN (Rejection by lapse of 90 day response period);

    e.   Karen A. Otis, LPN (Rejection by lapse of 90 day response period);

    f.   Carol Risden, LPN (Rejection by lapse of 90 day response period);

    g.   Ann E. Warden, RN (Rejection by lapse of 90 day response period);

    h.   St. Johns Mental Health Department (Lapse of 90 day response period);

    i.   St. Johns County Sheriff's Department (Lapse of 90 day response period);

    j.   John Richard Amman, LPN (Lapse of 90 day response period).

57. Plaintiffs have since provided Notice of Claims pursuant to F.S. 768.28 to following entities:

    a.   St. Johns County;

    b.   St. Johns County Sheriff's Department;

    c.   St. Johns County Mental Health Department;

    d.   Florida Department of Insurance.

## **VIOLATIONS OF PLAINTIFF'S CONSTITUTIONAL RIGHTS**

58. On or about September 28th, 1998, Larry Harvey, Jr., was incarcerated at the St. John's County Jail on misdemeanor charges.

59. Upon admission to the JAIL, Larry Harvey was medically screened by the nursing staff at the JAIL, and/or Defendant RISDEN.

60. Shortly after that evaluation, on September 29th, 1998, Defendant COHEN, by telephone, ordered the nursing staff to place Larry Harvey on Haldol Elixer, 5mg, two times a day, and Cogentin 1mg every morning, along with doses of Cogentin 2mg every night for three days.

61. Larry Harvey notified the nursing staff of his desire not to take the prescribed medication due to the side effects.

62. During the applicable time periods, Defendants TESSLER, COHEN, BALLARD, LOVETT, OTIS, RISDEN, WARDEN, AMMAN, BARNES, BARBER, PERRY and the St. Johns County Jail staff knew of Larry Harvey's repeated and unbearable suffering and debilitated state and knew of the seriousness of Larry Harvey's medical condition.

63. Despite their knowledge of the Ward's serious medical condition, these Defendants were repeatedly deliberately indifferent to Larry Harvey's serious medical needs, failed to perform appropriate diagnostic testing and delayed the provision of medical treatment in violation of Larry Harvey's constitutional rights.

64. These Defendants acted in total willful and wonton disregard of Larry Harvey's constitutional rights to be free from cruel and unusual punishment and to be provided with reasonable and proper medical services for his serious medical needs.

65. These Defendants' treatment of Larry Harvey during his stay at the JAIL fell so well below the applicable standard of care and was so cursory, grossly inadequate and incompetent as to violate the Eighth and Fourteenth Amendment of the United States Constitution.

## CLAIMS FOR RELIEF

## COUNT I - 42 U.S.C. §1983-DEFENDANTS COHEN, TESSLER, OTIS, BALLARD, LOVETT, RISDEN, WARDEN, and AMMAN

66. PLAINTIFFS reallege and incorporate by reference each previously stated paragraph as if fully set forth herein.

67. Defendants COHEN, TESSLER, OTIS, BALLARD, LOVETT, RISDEN, WARDEN, and AMMAN while acting under color of State law and by virtue of the authority vested in them by the State of Florida, and its agencies, demonstrated deliberate and willful and wanton indifference to Larry Harvey's serious medical needs and allowed Larry Harvey's medical condition to deteriorate substantially, and failed to address his serious medical needs, in violation of his constitutional rights as secured by the Eighth and Fourteenth Amendments.

68. Each of these Defendants participated in the care and medical treatment of Larry Harvey and had opportunities to and did observe his deteriorating condition.

69. For example, Defendant OTIS, was the LPN on duty on December 26th, 1998, and observed Mr. Harvey in a severely debilitated and unresponsive state. Specifically, Nurse Otis observed Mr. Harvey on the floor in a seated position at around 1:00 PM, and "spoke to him about eating and drinking more…" Mr. Harvey could only "mumble" an indiscernible response at that time and did not physically turn to acknowledge Nurse Otis' presence.

70. These Defendants all made similar observations and either prescribed medication to Larry Harvey (COHEN AND TESSLER), signed off on Inmate Progress Notes (TESSLER), and/or administered medication to Larry Harvey on various occasions throughout his incarceration, all resulting in severe adverse effects from overmedication and a downward progression to Larry Harvey's current vegetative state.

71. Despite observations of Larry Harvey's increasing debilitation, Defendants COHEN, TESSLER, OTIS, BALLARD, LOVETT, RISDEN, WARDEN, and AMMAN

failed to take steps to further evaluate Mr. Harvey's severely debilitated state, to
determine or evaluate the cause of his debilitation or to monitor his condition for life
threatening reactions to his medication, or to provide prompt emergency medical
treatment after having observed Mr. Harvey in a severely compromised condition just
before his final cardio-respiratory arrest, in total disregard of Larry Harvey's
constitutional rights guaranteed by the Eighth and Fourteenth Amendment.

72. More specifically Defendants COHEN, TESSLER, OTIS, BALLARD,
LOVETT, RISDEN, WARDEN, and AMMAN failed in one or more of the following
ways:

    a.    failed to ascertain an accurate diagnosis of Larry Harvey's
condition so as to enable proper treatment of Larry Harvey;

    b.    failed to adequately recognize, assess and address the significant
adverse drug effects that resulted in Larry Harvey's severe mental
and physical deterioration;

    c.    failed to properly dose and/or effectively assess the probable effect
and risks of increasing the dose of Larry Harvey's medication;

    d.    failed to take precautions to closely monitor and address adverse
effects of the medication;

    e.    failed to properly monitor, observe and address significant drug
toxicity and adverse reactions Larry Harvey was experiencing and
to provide supportive therapy accordingly;

f.     failed to implement policies and procedures to adequately address the situation where an inmate is in significant distress from overmedication;

g.     prescribed contraindicated and ineffective medications to Larry Harvey without reaching any diagnosis sufficient to justify the treatment provided;

h.     failed to accurately document Larry Harvey's medical records;

i.     failed to supervise and/or instruct nursing staff in their care of Larry Harvey, including initial assessments, triage for sick call, the administration of medicine and follow-up care; and,

j.     failed to establish and/or implement quality control measures.

73. As a direct and proximate result of the actions or failures to act on the part of Defendants COHEN, TESSLER, OTIS, BALLARD, LOVETT, RISDEN, WARDEN, and AMMAN Larry Harvey, experienced egregious pain and suffering, mental anguish, discomfort, deterioration, loss of the ability to enjoy life, shortened life span, mental incompetence and was rendered vegetative, and has suffered other reasonably foreseeable compensatory damages associated with expenses for his long term care, and will continue to incur tremendous long term care costs.

74. PLAINITFFS have retained the undersigned as counsel in pursuit of the protection of Larry Harvey's constitutional rights.

WHEREFORE, PLAINTIFFS pray for the entry of judgment against Defendants COHEN, TESSLER, OTIS, BALLARD, LOVETT, RISDEN, WARDEN, and AMMAN,

jointly and severally, for compensatory damages (past and future) in an amount as proved

at trial; for an award of punitive damages; for costs, expenses, and attorney's fees for this

action in accordance with 42 U.S.C. §1988; for a trial by jury; and for such other and

further relief as the court deems just and proper.

## COUNT II - 42 U.S.C. §1983-DEFENDANTS SHERIFF, TESSLER,

## BARNES, and BARBER

75. PLAINTIFFS reallege and incorporate by reference each previously stated

paragraph as if fully set forth herein.

76. SHERIFF PERRY, in his individual capacity, was responsible for the creation

and implementation of St. Johns County Jail policies and procedures related to the

conduct of its correctional officers.

77. Defendant SHERIFF entered into agreements with medical personnel to

provide medical services at the JAIL.

78. It is the written policy of the JAIL to provide appropriate medical services and

treatment to all prisoners housed in the St. Johns County Jail.

79. It is the written policy of the JAIL that prisoners of the St. Johns County Jail

that prisoners of the facility will be provided with medical and dental care necessary for

their health and welfare.

80. Defendant SHERIFF, while acting under color of State law, employed a

custom of violating the Department of Corrections own policies and procedures that

resulted in deliberate and/or willful and wanton indifference to Larry Harvey's serious

medical needs in the refusal or failure of the JAIL to obtain proper medical care for Larry

Harvey and deprived him of his rights secured under the Eighth and Fourteenth Amendments. To wit, Defendant, SHERIFF:

    a. Failed to provide adequate daily nursing care;

    b. Failed to instruct its nurses and correctional officers in the dispensing of prescribed medication, and the monitoring of adverse effects associated with the administration of those medications;

    c. Failed to train the correctional officers in recognizing severely debilitated inmates in need of immediate medical attention; and,

    d. Failed to respond to requests and pleas for medical attention by Larry Harvey.

81. Alternatively, Defendant SHERIFF, under color of State law, failed to enact or promulgate sufficient policies or procedures to insure against the deliberate indifference to Larry Harvey's serious medical needs as secured by the Eighth and Fourteenth Amendments. To wit, Defendant SHERIFF:

    a. Failed to provide adequate daily nursing care;

    b. Failed to instruct its nurses and correctional officers in the dispensing of prescribed medication, and the monitoring of adverse effects associated with the administration of those medications;

    c. Failed to train the correctional officers in recognizing severely debilitated inmates in need of immediate medical attention; and,

    d. Failed to respond to requests and pleas for medical attention by Larry Harvey.

82. Defendant BARNES was on duty the day of December 26th, 1998, and observed Mr. Harvey's severely deteriorated condition prior to his being found unconscious and unresponsive in his cell. Specifically, Deputy Barnes observed Mr. Harvey approximately one hour prior to the discovery of his respiratory collapse and noted the severely debilitated state he was in and his inability to verbally or physically respond.

83. Deputy BARNES took no action or steps to assist Mr. Harvey until another officer (Deputy North), an hour later, observed Mr. Harvey in his cell in the same position previously observed and expressed concern for him.

84. Defendant BARBER was on duty the day of December 26th, 1998, during the 7:00 AM to 3:00 PM shift and observed the severely deteriorated condition Mr. Harvey was in several times during his shift. Specifically, Deputy Barber observed Mr. Harvey's inability to eat breakfast or lunch, and inability to get out of bed. At around noon, Deputy Barber observed Mr. Harvey in a kneeling position on the side of his bed and was observed several times later still in the same position up through the remainder of Deputy Barber's shift. He remained in this general position until he was discovered by Correction Officer North, unresponsive and in respiratory arrest.

85. Even though Defendant BARBER observed Mr. Harvey in a severely debilitated state throughout the course of his shift, Defendant BARBER took no action or steps to assist Mr. Harvey or seek medical attention for him.

86. By showing deliberate indifference to Larry Harvey's debilitated condition and allowing his condition to continue to deteriorate, and by failing to provide assistance

and medical care, diagnosis and treatment, Defendants BARNES and BARBER repeatedly violated Larry Harvey's constitutional rights guaranteed by the Eighth and Fourteenth Amendment.

87. Defendants SHERIFF, BARNES, BARBER, and TESSLER demonstrated deliberate indifference to Larry Harvey's serious medical needs and allowed Larry Harvey's medical condition to deteriorate substantially, in violation of these rights.

88. As a direct and proximate result of the actions or failures to act on the part of Defendants, BARNES and BARBER, Larry Harvey experienced egregious pain and suffering, mental anguish, discomfort, deterioration, loss of the ability to enjoy life, shortened life span, has been rendered mentally incompetent and vegetative, and has suffered other reasonably foreseeable compensatory damages associated with expenses for his long term care, and will incur enormous additional costs and expenses in the future.

89. PLAINITFFS have retained the undersigned as counsel in pursuit of the protection of Larry Harvey's constitutional rights.

WHEREFORE, PLAINTIFFS pray for the entry of judgment against Defendants jointly and severally for compensatory damages (past and future) in an amount as proved at trial; for an award of punitive damages; for costs, expenses, and attorney's fees for this action in accordance with 42 U.S.C. §1988; for a trial by jury; and for such other and further relief as the court deems just and proper.

## COUNT III - MEDICAL MALPRACTICE-DR. COHEN, TESSLER, BALLARD,

## LOVETT, OTIS, RISDEN, AMMAN and WARDEN,

### (Wanton and Willful disregard of Larry Harvey's human rights and safety)

90. PLAINTIFFS reallege and incorporate by reference the previously stated paragraphs as if fully set forth herein.

91. Prior to filing this claim, the PLAINTIFFS served Defendants COHEN, TESSLER, BALLARD, LOVETT, OTIS, RISDEN, AMMAN and WARDEN by certified mail, return receipt requested, a notice of intent to initiate medical malpractice litigation and thereby, complied with the provisions set forth in Florida Statutes Section 766.106 (attached hereto and incorporated herein as (Exhibit D attached hereto).

92. PLAINTIFF has satisfied all conditions precedent to the filing of this action.

93. At all times material hereto Defendants COHEN, TESSLER, BALLARD, LOVETT, OTIS, RISDEN, AMMAN and WARDEN owed a duty to Larry Harvey to exercise that degree of skill, diligence and care that is recognized as acceptable and appropriate by reasonably prudent health care providers.

94. At all times relevant to this litigation, Defendant COHEN provided medical services and consultant services for the St. Johns County Jail, and was responsible for the health and provision of medical treatment to inmates at the St. Johns County Jail, including Larry Harvey.

95. At all times relevant to this litigation, Defendant TESSLER provided medical services and consultant services for the St. Johns County Jail, and was responsible for the

22

health and provision of medical treatment to inmates at the St. Johns County Jail,

including Larry Harvey.

96. At all times relevant to this litigation, Defendants BALLARD, LOVETT,

OTIS, RISDEN, AMMAN and WARDEN provided medical nursing services for the St.

Johns County Jail.

97. Defendants COHEN, TESSLER, BALLARD, LOVETT, OTIS, RISDEN,

AMMAN and WARDEN failed to properly, competently, and adequately render to Larry

Harvey, necessary medical treatment, deviated from the usual, ordinary and customary

standards of medical care and treatment generally exercised in the community, and

violated the duty to exercise reasonable care, and more specifically:

a.  failed to ascertain and accurately diagnose Larry Harvey's condition so as
    to enable proper treatment;

b.  failed to adequately recognize, assess and address the significant adverse
    drug effects that resulted in Mr. Harvey's severe mental and physical
    deterioration;

c.  failed to properly dose and/or effectively assess the probable effect and
    risks of increasing the dose of Mr. Harvey's medication and failure to take
    precautions to closely monitor and address adverse effects of the
    medication when such a significant change in dosage took place;

d.  failed to properly monitor, observe and address significant drug toxicity
    and adverse reactions Mr. Harvey was experiencing and to provide
    supportive therapy accordingly;

e.  failed to implement policies and procedures to adequately address the situation where an inmate is in significant distress from overmedication;

f.  prescribed contraindicated and ineffective medications to Larry Harvey without reaching any diagnosis sufficient to justify the treatment provided;

g.  failed to accurately document Larry Harvey's medical records;

h.  failed to supervise and/or instruct nursing staff in their care of Larry Harvey, including initial assessments, triage for sick call, the administration of medicine and follow-up care; and,

i.  failed to establish and/or implement quality control measures.

98. These failures on the part of these Defendants were committed in a manner exhibiting wanton and willful disregard of Larry Harvey's human rights and safety.

99. As a direct and proximate result of the aforementioned negligence and/or wanton and willful conduct of Defendants COHEN, TESSLER, BALLARD, LOVETT, OTIS, RISDEN, AMMAN and WARDEN, Larry Harvey repeatedly suffered serious pain, disability, mental pain and suffering, and loss of ability to enjoy the remainder of his life, and was rendered permanently mentally incompetent and vegetative, and suffered enormous economic loss, and will suffer tremendous economic losses in the future.

WHEREFORE, Plaintiffs pray that this Honorable Court enter a judgment in their favor against Defendants COHEN, TESSLER, BALLARD, LOVETT, OTIS, RISDEN, AMMAN and WARDEN for all recoverable damages (past and future), including punitive damages, as a jury may assess, plus interest, costs, and such other relief as the Court and jury may deem proper.

## COUNT IV - MEDICAL MALPRACTICE – SHERIFF and the JAIL (St. Johns County Sheriff's Department) (F.S. 768.28 liability)

100.    PLAINTIFFS reallege and incorporate by reference the previously stated paragraphs as if fully set forth herein.

101.    Prior to filing this claim, PLAINTIFFS served the St. Johns County Sheriff's Department and/or SHERIFF, by certified mail, return receipt requested, a notice of intent to initiate medical malpractice litigation and thereby, complied with the provisions set forth in Florida Statutes Section 766.106 (attached hereto and incorporated herein as (Exhibit E attached hereto).

102.    PLAINTIFFS have also presented their Notice of Claim on the St. Johns County Sheriff's Department and St. Johns County and the Department of Insurance pursuant to F.S. 768.28(6)(a), within the time required by statute, although no denial of the claims has been made.

103.    At all times material hereto, Defendant SHERIFF (in his official capacity) and the JAIL, acting by and through its employees, owed a duty to Larry Harvey to exercise that degree of skill, diligence and care that is recognized as acceptable and appropriate by reasonably prudent health care providers, including but not limited to:

   a.    assessing and evaluating Larry Harvey's requests and need for treatment;

   b.    ensuring Larry Harvey's necessary access to a primary care provider and/or specialist for evaluation and treatment;

   c.    responding to Larry Harvey's inmate request forms;

    d.   delivering Larry Harvey's medications in the proper dosage form and proper dose;

    e.   providing an infirmary for inmate care;

    f.   accurately documenting Larry Harvey's medical records;

    g.   following applicable rules and regulations including but not limited to St. Johns County Jail policies and procedures and the Florida Nurses Practice's Act; and,

    h.   complying with Florida Model Jail Standards regarding quality improvement, medical record retention and organization, a sick call procedure with daily sick call supervised by the health authority, and the appointment of an authorized health care authority.

104.    At all times relevant to this litigation, Defendant SHERIFF and the JAIL, acting by and through its medical service providers and employees, including but not limited to, COHEN, TESSLER, BALLARD, LOVETT, OTIS, RISDEN, WARDEN, and AMMAN, has provided medical services to inmates of the St. Johns County Jail, including Larry Harvey.

105.    Defendant SHERIFF and/or the JAIL breached one or more of the previously listed duties and failed to properly, competently, and adequately render to Larry Harvey necessary medical treatment, deviated from the usual, ordinary and customary standards of medical care and treatment generally exercised in the community, and violated the duty to exercise reasonable care, and more specifically:

a.  failed to ascertain an accurate diagnosis of Larry Harvey's condition so as to enable proper treatment;

b.  failed to adequately recognize, assess and address the significant adverse drug effects that resulted in Mr. Harvey's severe mental and physical deterioration;

c.  failed to properly dose and/or effectively assess the probable effect and risks of increasing the dose of Mr. Harvey's medication and failed to take precautions to closely monitor and address adverse effects of the medication after significant dose changes;

d.  failed to properly monitor, observe and address significant drug toxicity and adverse reactions Mr. Harvey was experiencing and to provide supportive therapy accordingly;

e.  failed to implement policies and procedures to adequately address the situation where an inmate is in significant distress from overmedication;

f.  prescribed contraindicated and ineffective medications to Larry Harvey, Jr., without reaching any diagnosis sufficient to justify the treatment provided;

g.  failed to accurately document Larry Harvey's medical records;

h.  failed to supervise and/or instruct nursing staff in their care of Larry Harvey, Jr., including initial assessments, triage for sick call, the administration of medicine and follow-up care; and,

i.  failed to establish and/or implement quality control measures.

106.    As a direct and proximate result of the aforementioned negligence of Defendant SHERIFF and/or the JAIL, Larry Harvey repeatedly suffered serious pain, disability, mental pain and suffering, and loss of ability to enjoy the remainder of his life, economic loss (past and future), and was rendered permanently mentally incompetent and vegetative.

WHEREFORE, Plaintiffs pray that this Honorable Court enter a judgment in their favor against Defendant SHERIFF and/or the JAIL for all recoverable damages (past and future) as a jury may assess, plus costs, and such other relief as the Court and jury may deem proper.

## COUNT V - MEDICAL MALPRACTICE – SJCMHD (St. Johns County Health Department) (F.S. 768.28 liability)

107.    PLAINTIFFS reallege and incorporate by reference the previously stated paragraphs as if fully set forth herein.

108.    Prior to filing this claim, PLAINTIFFS served SJCMHD, by certified mail, return receipt requested, a notice of intent to initiate medical malpractice litigation and thereby, complied with the provisions set forth in Florida Statutes Section 766.106 (attached hereto and incorporated herein as Exhibit F attached hereto).

109.    PLAINTIFFS have also presented their Notice of Claim on the SJCMHD and St. Johns County and the Department of Insurance pursuant to F.S. 768.28(6)(a), within the time required by statute, although no denial of the claims has been made.

110.    At all times material to this action, SJCMHD employed Defendant COHEN.

111.    At all times material hereto Defendant SJCMHD, acting by and through its employees, including but not limited to Defendant COHEN, owed a duty to Larry Harvey to exercise that degree of skill, diligence and care that is recognized as acceptable and appropriate by reasonably prudent health care providers, including but not limited to:

    a.   assessing and evaluating Larry Harvey's requests and need for treatment;

    b.   ensuring Larry Harvey's necessary access to a primary care provider and/or specialist for evaluation and treatment;

    c.   responding to Larry Harvey's inmate request forms;

    d.   delivering Larry Harvey's medications in the proper dosage form and proper dose;

    e.   providing an infirmary for inmate care;

    f.   accurately documenting Larry Harvey's medical records;

    g.   following applicable rules and regulations including but not limited to St. Johns County Jail policies and procedures and the Florida Nurses Practice's Act; and,

    h.   complying with Florida Model Jail Standards regarding quality improvement, medical record retention and organization, a sick call procedure with daily sick call supervised by the health authority, and the appointment of an authorized health care authority.

112.    At all times relevant to this litigation, Defendant SJCMHD, acting by and through its employees including but not limited to COHEN, provided medical services to inmates of the St. Johns County Jail, including Larry Harvey.

113.    Defendant SJCMHD breached one or more of the previously listed duties and failed to properly, competently, and adequately render to Larry Harvey necessary medical treatment, deviated from the usual, ordinary and customary standards of medical care and treatment generally exercised in the community, and violated the duty to exercise reasonable care, and more specifically:

a.  failed to ascertain an accurate diagnosis of Larry Harvey's condition so as to enable proper treatment;

b.  failed to adequately recognize, assess and address the significant adverse drug effects that resulted in Mr. Harvey's severe mental and physical deterioration;

c.  failed to properly dose and/or effectively assess the probable effect and risks of increasing the dose of Mr. Harvey's medication and failed to take precautions to closely monitor and address adverse effects of the medication after significant dose changes;

d.  failed to properly monitor, observe and address significant drug toxicity and adverse reactions Mr. Harvey was experiencing and to provide supportive therapy accordingly;

e.  failed to implement policies and procedures to adequately address the situation where an inmate is in significant distress from overmedication;

f.  prescribed contraindicated and ineffective medications to Larry Harvey, Jr., without reaching any diagnosis sufficient to justify the treatment provided;

g.   failed to accurately document Larry Harvey's medical records;

h.   failed to supervise and/or instruct nursing staff in their care of Larry
Harvey, Jr., including initial assessments, triage for sick call, the
administration of medicine and follow-up care; and,

i.   failed to establish and/or implement quality control measures.

114.   As a direct and proximate result of the aforementioned negligence of
Defendant SJCMHD, Larry Harvey repeatedly suffered serious pain, disability, mental
pain and suffering, and loss of ability to enjoy the remainder of his life, was rendered
permanently mentally incompetent and vegetative, and has incurred enormous economic
loss and will incur additional enormous economic losses in the future.

WHEREFORE, Plaintiffs pray that this Honorable Court enter a judgment in their
favor against Defendant SJCMHD for all recoverable damages (past and future) as a jury
may assess, plus costs, and such other relief as the Court and jury may deem proper.

## CERTIFICATE OF COUNSEL

The undersigned hereby certifies that a reasonable investigation gave rise to a
good faith belief that grounds exist for an action against the named Defendants for
medical negligence.

## TRIAL BY JURY

Plaintiff demands trial by jury in the above entitled action.

Dated this the 14th day of August, 2001.

JOSEPH D. LANE
FLORIDA BAR No: 0954550
COCHRAN, CHERRY, GIVENS & SMITH, P.C.
163 WEST MAIN STREET
PO BOX 927
DOTHAN, ALABAMA 36302
(334) 793-1555
(334) 793-8280 facsimile

Defendants may be served at:

John Richard Amman
109 Trier Lane
St. Augustine, Florida 32095

Charlotte Ballard
6894 Pomar Rd.
St. Augustine, Florida 32086

Vicki Marie Mullins Lovett
227 Circle Dr. E.
St. Augustine, Florida 32095

Karen A. Otis, LPN
6892 Sea Place
St. Augustine, Florida 32086; and

St. Johns County Sheriff's Department
4015 Lewis Speedway
St. Augustine, Florida 32095

Sheriff Neil J. Perry
c/o St. Johns County Sheriff's Department
4015 Lewis Speedway
St. Augustine, FL 32095

Christopher E. Barnes
c/o St. Johns County Sheriff's Department
4015 Lewis Speedway

St. Augustine, FL  32095

Keith T. Barber
c/o St. Johns County Sheriff's Department
4015 Lewis Speedway
St. Augustine, FL  32095

Carol Risden, LPN
St. Johns County Sheriff's Department
4015 Lewis Speedway
St. Augustine, Florida  32095

Ann E. Dohner Warden (RN)
401 B Street
St. Augustine, Florida  32084

Dr. Stanley A. Cohen
Psychological Services
236 South Park Circle East
St. Augustine, Florida 32086

Dr. Michael Tessler
232 South Park Circle
St. Augustine, FL   32086

St. Johns County Mental Health Department
1955 U.S. 1 South
Suite C-2
St. Augustine, Florida 32086

St. Johns County Sheriff's Department
3955 Lewis Speedway
St. Augustine, FL  32095

*LAW OFFICES OF*

# COCHRAN, CHERRY,
# GIVENS & SMITH, P.C.

163 WEST MAIN STREET • POST OFFICE BOX 927
DOTHAN, ALABAMA 36302
(334) 793-1555 • FAX: (334) 793-8280

August 13, 2001

St. Johns County Sheriff's Department
ATTENTION: Sheriff Neil Perry
4015 Lewis Speedway
St. Augustine, FL 32092

St. Johns County
ATTENTION: Head of Agency
4020 Lewis Speedway
St. Augustine, FL 32095

St. Johns County Mental Health Department
ATTENTION: Department Head
1955 U.S. 1 South
Suite C-2
St. Augustine, FL 32086

Florida Department of Insurance
ATTENTION: Department Head
Larson Building Room 545
200 East Gaines Street
Tallahassee, FL 32399

Dear Sirs and/or Madams:

Please allow this to serve as Notice of Claim against St. Johns County, St. Johns County Sheriff's Department, St. Johns County Mental Health Department and the Florida Department of Insurance, pursuant to F.S. § 768.28. These claims are brought on behalf of Larry Harvey, Jr., by his Guardians, Geraline Felton and Regina Adams pursuant to their authority as plenary Guardians for Larry Harvey, Jr., (Exhibit A attached hereto), by and through their undersigned attorney, Joseph D. Lane.

Larry Harvey, Jr. was born March 25, 1973 and his social security number is 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. At this time, no prior adjudicated claims in excess of $200 against Larry Harvey, Jr., are known.

## SUMMARY

This case involves a personal injury claim against St. Johns County, and/or St. Johns County Sheriff's Department, and/or the St. Johns County Mental Health Department. On December 26th, 1998, Larry Harvey, Jr., was found in his jail cell, on the floor up against his bed, unconscious, unresponsive, in cardiac and respiratory failure. He never regained consciousness and remains in a vegetative state in a long term care facility in St. Augustine, Florida. It is claimants' contention that Mr. Harvey's current vegetative state is the result of medical negligence on the part of medical care providers working for or on behalf of the St. Johns County Jail, and/or the St. Johns County Sheriff's Department. It is also Claimants contention that general staff at the St. Johns County Jail neglected to perform their jobs according to acceptable standards, and failed to recognize Mr. Harvey's severe mental and physical deterioration and provide him with proper medical attention and prevent his respiratory and cardiac collapse.

---

Notice of Intent to initiate Medical Negligence Litigation against various care givers has previously been sent (Exhibit B attached hereto). The facts leading up to Mr. Harvey's collapse are as follows.

## OPERATIVE FACTS

On or about September 28th, 1998, Larry Harvey, Jr. was placed into the St. Johns County Jail. Shortly after his admission, Dr. Stanley Cohen, an employee of St. Johns County Mental Health Department and a doctor of osteopathy providing medical services to the St. Johns County Jail, by telephone order, instructed that Mr. Harvey be placed on anti-psychotic medication, to wit, Haldol 5 mg Elixir two times a day along with Cogentin .5 mg every morning and 2 mg at night.

After experiencing adverse affects from the medication, Mr. Harvey refused several doses of his medication on October 1st through October 3rd, informing the nursing staff of his adverse side affects. Shortly thereafter, on or about October 6th, Dr. Cohen changed Mr. Harvey's Haldol from the 5 mg two times a day dose to Haldol Deconate100mg IM injection per month. The Haldol Deconate is a long acting, sustained release formulation that is slowly released in the body over time.

Ann Warden, the head nurse at the jail, agreed with the recommendation to change the Haldol to a long acting sustained release form of the medication. Mr. Harvey received the first dose of this long acting sustained release preparation on the morning of October 7th. At that time, Mr. Harvey's Cogentin medication was changed to an as needed basis. On October 9th, Dr. Cohen purportedly changed the Cogentin dose back to 2mg at night to treat the side effects from the previously given Haldol. Although Dr. Cohen's Cogentin order seemed to require routine dosing of the Cogentin, Mr. Harvey received sporatic doses of the Cogentin after this change in the order.

Dr. Cohen's notes indicate that he first saw Mr. Harvey on October 14th or 15th, 1998. Inconsistent with the Medication Administration Record (MAR) of what medications were given, Dr. Cohen's October 15th notes indicate that the Haldol 10 mg every night was to continue, (along with Cogentin 2mg at night) even though Mr. Harvey had previously been given Haldol Deconate 100mg on October 7th.

After the October 7th change to the dose of 100mg long acting Haldol injection, Mr. Harvey began to experience marked sedation and extrapyramidal symptoms, and experienced fainting. He was evaluated by Dr. Tessler on October 9th and placed on medical watch at that time. An EKG conducted on October 14th indicated an abnormal change suggestive of inferior lateral left ventricular ischemia.

Mr. Harvey's lethargy continued and on October 17th he was found unresponsive on the floor of his cell and "would" not speak or get up. On October 20th, Dr. Cohen changed his PRN Cogentin to 2 mg BID (twice a day) after a 2 mg IM dose was given immediately.

Again, inconsistent with the MAR and Inmate progress notes for that date, Dr. Cohen's October 20th notes indicate that he was reducing the Haldol dose to 7.5 mg every night at bedtime, and increasing the Cogentin to 3 mg at bedtime.

On November 3rd, Dr. Cohen saw Mr. Harvey and noted the extrapyramidal symptoms including choreiform tongue movements and lip tremors. Consequently, Dr. Cohen ordered the Haldol Deconate (long acting sustained release) injection dosing reduced to 75 mg IM per month starting on November 9th and continued the Cogentin 2 mg orally two times a day. He also noted Mr. Harvey's inability to sleep and prescribed trazodone 75 mg every night.

According to the Inmate Progress Notes, on November 9th, Richard Ammons, LPN,  gave Mr. Harvey a 100 mg dose of the Haldol Deconate, contrary and inconsistent to the MAR instructions and notation for that date and a previous order of a dose of 75 mg of the Haldol Deconate. Following this dose, Mr. Harvey endured the adverse effects and extrapyramidal symptoms from the medication up through November 20th when the records indicate that Mr. Harvey himself made a written request to have his medication adjusted.

Dr. Cohen saw Mr. Harvey again on December 1, 1998, and noted the continuing extrapyramidal symptoms. Mr. Harvey complained about the effects of the long acting medication and requested that he not be forced to take it. At that time, Dr. Cohen changed Mr. Harvey's medication from Haldol Deconate to Haldol 10 mg tablets every night along with Cogentin 2 mg tablets twice a day and trazodone 75 mg every night. The Haldol 10 mg dosing was begun on December 1st.

On December 5th, Mr. Harvey did not take the nighttime dose of Cogentin, Haldol and trazodone. Although Mr. Harvey took the medications the following evening (December 6th), as indicated by the MAR, Dr. Cohen was notified of Mr. Harvey's missed December 5th doses and telephoned in an order to discontinue all of Mr. Harvey's medications.

At that point, Mr. Harvey had received 5 doses of 10 mg Haldol in December combined with the remaining November 9th 100 mg injection of Haldol Deconate that was still being released in Mr. Harvey's system. After the morning of December 7th, Mr. Harvey was not receiving any further Cogentin to counter the effects of the Haldol still in his system and received no further additional medication until December 15th.

On December 10th, Mr. Harvey was found passed out on the floor of his cell and was moved to "Sick Cell" 27 4-A for observation late on December 10th. He was noted to have eaten very little of his breakfast on December 11th and was very unstable on his feet. Later on in the morning of December 11th he was moved back to isolation.

On December 13th, Mr. Harvey did not eat his lunch, and it was noted that when he was released from his restraints temporarily, he was very unstable, falling backwards and almost hitting his head on the door jamb. He was observed to have been incontinent and was placed into the shower and given clean boxer shorts to put on before being placed back in his arm and leg restraints in his cell. He was noted at this time (10:50 PM on December 13th) to be very unresponsive.

On December 14th, it was noted that Mr. Harvey did not eat his lunch and that he "refused to get up." On December 15th, it was noted that Mr. Harvey was taking some fluids at that time, but that he was having trouble eating.

On December 15th Dr. Tessler ordered Mr. Harvey to be moved to a "Sick Cell" for closer observation and to force fluids and place him on a soft diet, consistent with the witness reports that Mr. Harvey was unable to eat or drink or take care of himself.

Also on December 15th, Dr. Cohen phoned in an order to restart Mr. Harvey's Haldol, to be given by intramuscular injection at a dose of 10 mg immediately and two times a day, a dose twice that of any previously recorded daily dosing for Mr. Harvey. Additionally, Dr. Cohen ordered an injection of Haldol Deconate 75 mg to be given immediately along with a 10 mg injection of Cogentin.

On December 16th, an EKG was performed and showed abnormalities suggestive of possible anteriolateral ventricular ischemia and inferior ventricular ischemia. Mr. Harvey's heart rate was found to be markedly elevated consistently throughout December 15th and 16th as well. Additionally, the Progress Notes indicate that Mr. Harvey required assistance on December 17th to go to the toilet, and that he appeared weak.

The twice a day Cogentin 2 mg injections and Haldol 10 mg (2 per day) injections continued through December 22nd, at which time all medications were stopped, including the Cogentin. By December 22nd, Mr. Harvey had received a total of 15 injections of 10 mg of Haldol (150 mg) in addition to the 75 mg of the slow release Haldol Deconate.

On December 20th, Mr. Harvey was moved back to his isolation cell (Block 15, cell 3A) for the last time. His Haldol daily injections stopped on December 22.

From December 22nd through December 26th, the records are practically void of any indication that Mr. Harvey was being medically monitored for adverse reactions to Haldol in his system. The Inmate Condition Check reports for December 22nd and 23rd indicate that Mr. Harvey had made a request for medical attention, and that the medical staff was advised of his request. There is no indication in the available records that Mr. Harvey received any response to these documented requests for medical attention on December 22nd, 23rd, or 24th. On December 25th, the Inmate Condition Check report indicates that Mr. Harvey was so debilitated that he had to have assistance to lie down on his bed, after being given some milk. He had no breakfast. Mr. Harvey was given a single dose of Cogentin 2 mg IM on December 25th after Nurse Amman observed him in a withdrawn state, sweating, with hand retractions.

The Inmate Condition Check reports for December 20th through December 26th indicated that Mr. Harvey showed virtually no activity at all. He was merely seen lying on his bed almost the entire time from December 20th through December 26th.

At about 12:30 PM on December 26th, Mr. Harvey was observed by jail staff kneeling over and beside his bed and on the floor and was found about 4 hours later in the same position, unconscious, and without respiration or pulse.

## CLAIM FOR DAMAGES

It is Claimants' contention that St. Johns County Sheriff's Department and the St. Johns County Mental Health Department, acting through its employees, including but not limited to Dr. Michael Tessler, Dr. Stanley Cohen, Charlotte Ballard, LPN, Vicki Marie Mullins Lovett, LPN, Karen A. Otis, LPN, Carol Risden, LPN, John Richard Amman, LPN, and Ann E. Dohner Warden, RN., failed to provide reasonable and customary medical care to Mr. Harvey. To wit, these employees and agents, acting within the line a scope of their employment or agency for the Sheriff's Department and the County Mental Health Department:

1. failed to ascertain an accurate diagnosis of Larry Harvey's condition so as to enable him to properly treat the Plaintiff;

2. failed to adequately recognize, assess and address the significant adverse drug effects that resulted in Mr. Harvey's severe mental and physical deterioration;

3. failed to properly dose and/or effectively assess the probable effect and risks of increasing the dose of Mr. Harvey's medication and failed to take precautions to closely monitor and address adverse effects of the medication when such a significant change in dosage took place;

4. failed to properly monitor, observe and address significant drug toxicity and adverse reactions Mr. Harvey was experiencing and to provide supportive therapy accordingly;

5. failed to implement policies and procedures to adequately address the situation where an inmate is in significant distress from overmedication;

6. prescribed contraindicated and ineffective medications to Larry Harvey, Jr., without reaching any diagnosis sufficient to justify the treatment provided;

7. failed to accurately document Larry Harvey's medical records;

8. failed to supervise and/or instruct nursing staff in their care of Larry Harvey, Jr., including initial assessments, triage for sick call, the administration of medicine and follow-up care; and,

9. failed to establish and/or implement quality control measures.

As a direct result of the aforementioned negligence, Larry Harvey repeatedly suffered serious pain, disability, mental pain and suffering, and loss of ability to enjoy the remainder of his life, and has been rendered permanently mentally incompetent and vegetative. Consequently,

Claimants seek compensation for all recoverable damages, for past medical expenses, past and future pain and suffering, loss of enjoyment of life, and future economic losses, including, but not limited to, future medical cost, loss of income.

Please consider these claims and provide me with a response as soon as possible.

Sincerely,

**COCHRAN, CHERRY,**
**GIVENS & SMITH, P.C.**

Joseph D. Lane

JDL/pma
Enclosures

EXHIBIT A

IN THE CIRCUIT COURT FOR THE SEVENTH JUDICIAL CIRCUIT
ST. JOHNS COUNTY, FLORIDA

IN RE:  GUARDIANSHIP OF          PROBATE DIVISION

LARRY HARVEY, JR.               CASE NO.: *699-432*

                                DIVISION: *55*


## LETTERS OF GUARDIANSHIP
## OF THE PERSON AND PROPERTY

TO WHOM IT MAY CONCERN:

WHEREAS, GERALINE FELTON and REGINA ADAMS have been
appointed the co-guardians of the person, property and estate of
LARRY HARVEY, JR. (the Ward), and has taken the prescribed oath
and performed all other acts prerequisite to issuance of letters
of guardianship of the person, property and estate.

NOW, THEREFORE, I, the undersigned Judge of the above
entitled court, declare GERALINE FELTON and REGINA ADAMS duly
qualified under the laws of the State of Florida to act as the
co-guardians of LARRY HARVEY, JR., (the Ward), with full power to
have the care, custody and control of the Ward, to exercise all
delegable legal rights and powers of the Ward, to administer the
estate of the Ward according to law, and to take possession of
and to hold, for the benefit of the Ward, all the property of the
Ward, and of all the rents, income, issues and profits from it.

ORDERED this ____*19*____ day of ____*JAN*_____, 2000.


                              /s/ RICHARD G. WEINBERG
                              _____
                              CIRCUIT JUDGE


cc:  Angela J. Mason, Esq.
     Robin H. Conner, Esq.

IN THE CIRCUIT COURT FOR ST. JOHNS COUNTY, FLORIDA

PROBATE DIVISION

IN RE:  LARRY HARVEY, JR.                    FILE NO.:  99-431 CP

    An alleged incapacitated person          DIVISION:  55

ORDER DETERMINING TOTAL INCAPACITY

On the Petition to Determine Incapacity filed herein with respect to LARRY HARVEY, JR., (the Ward), the Court having taken testimony, having considered the report of the Examining Committee, having considered all alternatives to guardianship, and being fully advised in the premises, finds, based on the clear and convincing evidence presented as follows:

1.  The nature and scope of the Ward's incapacities are:

    Persistent Vegetative State
    Hypoxic Encephalopathy
    Extensive Brain Damage

2.  The following facts demonstrate that the Ward is totally without capacity to care for the Ward's person or property.

3.  The Ward totally lacks capacity to make informed decisions about care and treatment or to meet the essential requirements for the Ward's physical or mental health or safety; is subject to total legal disability; is incapable of exercising any rights; and a guardian must exercise all delegable rights of the Ward and have full powers and duties with respect to the Ward and the Ward's person and property.

4.  After consideration of reasonable alternatives to guardianship, the Court finds that no alternative will sufficiently address the problems and needs of the Ward.

5.   Other than those rights set forth in subsection 744.3215(1), Florida Statutes, which are expressly reserved to the Ward, the Ward is not capable of exercising any other rights and all delegable rights of the Ward should be delegated to a plenary guardian.  Accordingly, it is

ADJUDGED as follows:

1.   LARRY HARVEY, JR., is hereby determined to be totally incapacitated and that a plenary guardian should be appointed to provide for the welfare and safety of the Ward.

2.   A copy of this Order shall be served on the Ward and the Ward's attorney by the clerk of this court and a certificate attesting to such service promptly filed in this proceeding.

ORDERED on _____, 2000.

_____
Circuit Judge

Copies to:
  Robin Conner, Esq.
  Angela J. Mason, Esq.
  David M. Andrews, Esq.

IN THE CIRCUIT COURT FOR THE SEVENTH JUDICIAL CIRCUIT
ST. JOHNS COUNTY, FLORIDA

IN RE:  GUARDIANSHIP OF

LARRY HARVEY, JR.

PROBATE DIVISION

CASE NO. _CP99-432_

DIVISION: _55_

## ORDER APPOINTING NATURAL GUARDIAN OF
## PERSON AND PROPERTY
### (incapacitated person)

The petitions of GERALDINE FELTON and REGINA L. ADAMS for the appointment of natural guardians of the person and property of LARRY HARVEY, JR., (the Ward), coming on this day to be heard and it appearing to the court that the Ward is totally incapacitated as found by Order of this Court entered _Jan 19_ _2000_, ~~1999~~, and that it is necessary for a natural guardian to be appointed for the person, property and estate of the Ward, and the court having jurisdiction and being fully advised; it is

ADJUDGED that GERALDINE FELTON and REGINA L. ADAMS are hereby appointed as natural co-guardians of the person and property of LARRY HARVEY, JR.

ADJUDGED FURTHER that upon taking the prescribed oath, filing designation of resident agent and entering into a bond in the amount of $ _—0—_ , payable to the Governor of the State of Florida and to his successors in office, conditioned on the faithful performance of all duties by the co-guardians, according to law, letters of guardianship shall be issued.

ADJUDGED FURTHER that the co-guardians must place (all of the personal assets of the Ward) (the following personal assets of the

minor):

in a restricted account in a financial institution designated pursuant to Section 69.031, Florida Statutes.

ORDERED this _19_ day of _____, _2000_.

/s/ Richard O. Kleinberg
_____
CIRCUIT JUDGE

Copy to:
David M. Andrews, Esquire

EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

In re: LARRY HARVEY, Jr.,        )
                                  )
v.                               )
                                  )
ST. JOHNS COUNTY SHERIFF'S    )
DEPARTMENT AND OTHERS       )
                                  )     Civil Action No. _____
                                  )
                                  )



**PETITION TO THE CLERK OF THE UNITED STATES DISTRICT COURT
FOR MIDDLE DISTRICT OF FLORIDA FOR EXTENSION OF STATUTE OF
LIMITATIONS PURSUANT TO FLORIDA STATUTE 766.104(2).**

Come now Petitioners, by and through their undersigned counsel, and submit their

petition for an automatic extension of the statute of limitations in the matter described

above and below pursuant to Florida Statute § 766.104(2). See attached. As a basis for

this petition, Petitioners state the following:

1.     This matter concerns potential medical negligence claims against various St.

     Johns County Sheriff's Department employees and/or agents or

     subcontractors, the identity of which has not been fully made at this time, but

     who are subject to the Medical Negligence pre-suit requirements under

     Chapter 766 of the Florida Statutes, and are subject to the two-year statute of

     limitations for Medical Negligence actions pursuant to Florida Statute 95.11,

     and the 90 extension of the two year statute of limitation allowed pursuant to §

     766.104(2).

2.      Petitioners assert that this Court will have jurisdiction over this matter since Mr. Harvey was denied proper medical treatment under circumstances warranting such treatment and that this fact and others will support a Federal Question claim arising out of 42 U.S.C § 1983.

3.      Larry Harvey, Jr., is and was a resident of St. Johns County, Florida at all times material to this matter.  Larry Harvey is mentally incompetent to handle his own affairs.  Mr. Harvey's Social Security number is 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.  Mr. Harvey was born March 25, 1973, and is currently 27 years old.  He is currently a long term patient at Bayview-Samantha Wilson Care Center, in St. Augustine, St. Johns County, Florida.  Mr. Harvey, in light of his comatose condition, is incapable of executing any of the rights enumerated in section 744.3215, Fla. Stat.

4.      The potential medical negligence claims arose out of injuries and damages which Mr. Harvey sustained while incarcerated in jail in St. Johns County, Florida.

5.      Petitioners, who will be named parties to suit in this matter do not yet know the identities of all parties who might be named as defendants in claims which may fall under Florida's pre-suit medical negligence requirements as set out in Florida Statutes § 766.106, and related statutes.

6.      Co-Petitioner, Geraline Felton, is 48 years old, and resides at 284 Knowlton St., St. Augustine, in St. Johns County, in the state of Florida.  Petitioner is the natural mother of the Ward, Larry Harvey, Jr., and has been duly appointed to serve as plenary co-guardian of Larry Harvey, Jr.  See attached.

7.  Co-Petitioner, Regina Adams is the natural half-sister of Larry Harvey, Jr., resides in Douglas, Georgia, and owns property in St. Johns County, Florida, and has been duly appointed to serve as plenary co-guardian of Larry Harvey, Jr. See attached.

8.  This case involves potential medical negligence of Larry Harvey, Jr., who during all relevant times to this action, was incarcerated in the St. John County Jail in St. Augustine, Florida. On December 26, 1998, Larry Harvey, Jr., while still incarcerated, and in the custody and care of the St. Johns County Sheriff's Department, was found unconscious in his jail cell. At that time, Mr. Harvey had been in jail for approximately three months during which time, he was being given various medications purportedly for the treatment of mental disorders. Ultimately, it was presumed that Mr. Harvey suffered some type of medical event which culminated in full respiratory arrest and subsequent brain damage and resulted in his complete incompetence. He remains in a vegetative state to this date.

9.  As a result of Mr. Harvey's incompetence, Petitioners Geraline Felton and Regina Adams were appointed guardians and conservators over Mr. Harvey and his affairs with complete rights and duties with regards to all actions to be taken on his behalf.

10.  Pursuant to Florida Statute 95.11, the Statute of Limitations for the above potential medical negligence claims would run on December 26, 2000.

11.  The automatic 90-day extension of above stated statute of limitation would place the extended limitation of action on March 26, 2001.

Wherefore, Petitioners/Guardians of Larry Harvey, Jr., hereby submit this Petition for the automatic 90-day extension allowed for this potential medical negligence claim for additional time to complete the reasonable pre-suit investigation as contemplated and set out in Chapter 766 of the Florida Statutes.

Respectfully submitted this the 22nd day of December, 2000.

LAW OFFICES OF COCHRAN,
CHERRY, GIVENS & SMITH

JOSEPH D. LANE, ESQ.
**Attorney for Petitioners**

**JOSEPH D. LANE, ESQ. (FSBN 0954550)**
**COCHRAN, CHERRY, GIVENS & SMITH, P.C.**
**163 West Main Street**
**P.O. Box 927**
**Dothan, Alabama 36302**
**Telephone: (334) 793-1555**
**Facsimile: (334) 793-8280**

Florida Statute 766.104  **Pleading in medical negligence cases; claim for punitive damages.--**

(1)  No action shall be filed for personal injury or wrongful death arising out of medical negligence, whether in tort or in contract, unless the attorney filing the action has made a reasonable investigation as permitted by the circumstances to determine that there are grounds for a good faith belief that there has been negligence in the care or treatment of the claimant. The complaint or initial pleading shall contain a certificate of counsel that such reasonable investigation gave rise to a good faith belief that grounds exist for an action against each named defendant. For purposes of this section, good faith may be shown to exist if the claimant or his or her counsel has received a written opinion, which shall not be subject to discovery by an opposing party, of an expert as defined in s. 766.102 that there appears to be evidence of medical negligence. If the court determines that such certificate of counsel was not made in good faith and that no justiciable issue was presented against a health care provider that fully cooperated in providing informal discovery, the court shall award attorney's fees and taxable costs against claimant's counsel, and shall submit the matter to The Florida Bar for disciplinary review of the attorney.

(2)  Upon petition to the clerk of the court where the suit will be filed and payment to the clerk of a filing fee, not to exceed $25, established by the chief judge, an automatic 90-day extension of the statute of limitations shall be granted to allow the reasonable investigation required by subsection (1). This period shall be in addition to other tolling periods. No court order is required for the extension to be effective. The provisions of this subsection shall not be deemed to revive a cause of action on which the statute of limitations has run.

**History.**--s. 12, ch. 85-175; s. 68, ch. 86-160; s. 8, ch. 86-287; s. 71, ch. 95-211; s. 1151, ch. 97-102.

RECEIPT FOR PAYMENT
DISTRICT COURT OF MIDDLE
FLORIDA
JACKSONVILLE DIVISION

J003356

RECEIVED FROM:

COCHRAN, CHERRY, GIVENS &
SMITH, P.C.
P.O. BOX 927
DOTHAN, AL 36302

Case Number: 3:00CV01370

F/U/B/O:

Party ID:

| Tender Type: | CHECK | |
| 01-086900 | | $60.00 |

Civil Filing-086900

Remarks:

| 01-510000 | | $90.00 |

Civil Filing-510000

Remarks:

| Subtotal: | $150.00 |

| Receipt Total: | $150.00 |

\* Checks and drafts are accepted
subject to collections and full
credit will only be given when
the check or draft has been
accepted by the financial
institution on which it was drawn.

Date: 12/26/00
Clerk:

EW

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Clerk, US District Court
Middle District of Florida
U.S. Courthouse
311 W. Monroe St., Ste. 110
Jacksonville, Fl 32202

**COMPLETE THIS SECTION ON DELIVERY**

A. Received by (Please Print Clearly)   B. Date

C. Signature
X  Elke Ward

D. Is delivery address different from item 1?
If YES, enter delivery address below:

3. Service Type
☑ Certified Mail   ☐ Express Mail
☐ Registered   ☑ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐

2. Article
7(

PS F

102595-

### IN THE CIRCUIT COURT OF ST. JOHNS COUNTY, FLORIDA

In re:  LARRY HARVEY, Jr.,           )
                                      )
v.                                    )
                                      )
ST. JOHNS COUNTY SHERIFF'S            )
DEPARTMENT AND OTHERS                 )
                                      )      Civil Action No. _____
                                      )
                                      )

### PETITION TO THE CLERK OF THE CIRCUIT COURT OF ST. JOHNS COUNTY FOR EXTENSION OF STATUTE OF LIMITATIONS PURSUANT TO FLORIDA STATUTE 766.104(2).

Come now Petitioners, by and through their undersigned counsel, and submit their petition for an automatic extension of the statute of limitations in the matter described above and below pursuant to Florida Statute § 766.104(2). See attached. As a basis for this petition, Petitioners state the following:

1.    This matter concerns potential medical negligence claims against various St. Johns County Sheriff's Department employees and/or agents or subcontractors, the identity of which has not been fully made at this time, but who are subject to the Medical Negligence pre-suit requirements under Chapter 766 of the Florida Statutes, and are subject to the two-year statute of limitations for Medical Negligence actions pursuant to Florida Statute 95.11, and the 90 extension of the two year statute of limitation allowed pursuant to § 766.104(2).

2.    Larry Harvey, Jr., is and was a resident of St. Johns County, Florida at all times material to this matter. Larry Harvey is mentally incompetent to handle

his own affairs. Mr. Harvey's Social Security number is 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. Mr. Harvey was born March 25, 1973, and is currently 27 years old. He is currently a long term patient at Bayview-Samantha Wilson Care Center, in St. Augustine, St. Johns County, Florida. Mr. Harvey, in light of his comatose condition, is incapable of executing any of the rights enumerated in section 744.3215, Fla. Stat.

3.    The potential medical negligence claims arose out of injuries and damages which Mr. Harvey sustained while incarcerated in jail in St. Johns County, Florida.

4.    Petitioners, who will be named parties to suit in this matter do not yet know the identities of all parties who might be named as defendants in claims which may fall under Florida's pre-suit medical negligence requirements as set out in Florida Statutes § 766.106, and related statutes.

5.    Co-Petitioner, Geraline Felton, is 48 years old, and resides at 284 Knowlton St., St. Augustine, in St. Johns County, in the state of Florida. Petitioner is the natural mother of the Ward, Larry Harvey, Jr., and has been duly appointed to serve as plenary co-guardian of Larry Harvey, Jr. See attached.

6.    Co-Petitioner, Regina Adams is the natural half-sister of Larry Harvey, Jr., resides in Douglas, Georgia, and owns property in St. Johns County, Florida, and has been duly appointed to serve as plenary co-guardian of Larry Harvey, Jr. See attached.

7.    This case involves potential medical negligence of Larry Harvey, Jr., who during all relevant times to this action, was incarcerated in the St. John

County Jail in St. Augustine, Florida. On December 26, 1998, Larry Harvey, Jr., while still incarcerated, and in the custody and care of the St. Johns County Sheriff's Department, was found unconscious in his jail cell. At that time, Mr. Harvey had been in jail for approximately three months during which time, he was being given various medications purportedly for the treatment of mental disorders. Ultimately, it was presumed that Mr. Harvey suffered some type of medical event which culminated in full respiratory arrest and subsequent brain damage and resulted in his complete incompetence. He remains in a vegetative state to this date.

8.  As a result of Mr. Harvey's incompetence, Petitioners Geraline Felton and Regina Adams were appointed guardians and conservators over Mr. Harvey and his affairs with complete rights and duties with regards to all actions to be taken on his behalf.

9.  Pursuant to Florida Statute 95.11, the Statute of Limitations for the above potential medical negligence claims would run on December 26, 2000.

10.  The automatic 90-day extension of above stated statute of limitation would place the extended limitation of action on March 26, 2001.

Wherefore, Petitioners/Guardians of Larry Harvey, Jr., hereby submit this Petition for the automatic 90-day extension allowed for this potential medical negligence claim for additional time to complete the reasonable pre-suit investigation as contemplated and set out in Chapter 766 of the Florida Statutes.

Respectfully submitted this the 22nd day of December, 2000.

LAW OFFICES OF COCHRAN,
CHERRY, GIVENS & SMITH

JOSEPH D. LANE, ESQ.
**Attorney for Petitioners**

JOSEPH D. LANE, ESQ. (FSBN 0954550)
COCHRAN, CHERRY, GIVENS & SMITH, P.C.
163 West Main Street
P.O. Box 927
Dothan, Alabama 36302
Telephone: (334) 793-1555
Facsimile: (334) 793-8280

IN THE CIRCUIT COURT FOR THE SEVENTH JUDICIAL CIRCUIT
ST. JOHNS COUNTY, FLORIDA

IN RE:  GUARDIANSHIP OF

LARRY HARVEY, JR.

PROBATE DIVISION

CASE NO.:  *6099-432*

DIVISION:  *55*

## LETTERS OF GUARDIANSHIP
## OF THE PERSON AND PROPERTY

**TO WHOM IT MAY CONCERN:**

**WHEREAS, GERALINE FELTON** and **REGINA ADAMS** have been appointed the co-guardians of the person, property and estate of **LARRY HARVEY, JR.** (the Ward), and has taken the prescribed oath and performed all other acts prerequisite to issuance of letters of guardianship of the person, property and estate.

NOW, THEREFORE, I, the undersigned Judge of the above entitled court, declare **GERALINE FELTON** and **REGINA ADAMS** duly qualified under the laws of the State of Florida to act as the co-guardians of **LARRY HARVEY, JR.**, (the Ward), with full power to have the care, custody and control of the Ward, to exercise all delegable legal rights and powers of the Ward, to administer the estate of the Ward according to law, and to take possession of and to hold, for the benefit of the Ward, all the property of the Ward, and of all the rents, income, issues and profits from it.

ORDERED this _____*19*_____ day of _____*JAN*_____, 2000.


/s/ RICHARD G. WEINBERG
_____
CIRCUIT JUDGE

cc:  Angela J. Mason, Esq.
     Robin H. Conner, Esq.

SENDER: COMPLETE THIS SECTION

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Clerk of Court
St. Johns County
4010 Lewis Speedway
St. Augustine, Fl 32084

A. Received by (Please Print Clearly)    B. Date

C. Signature

D. Is delivery address different from item 1?
   If YES, enter delivery address below:

3. Service Type
   ☐ Certified Mail    ☐ Express Mail
   ☐ Registered       ☐ Return Receipt for M:
   ☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)

2.

PS                                                    102595-

EXHIBIT C

**In re MATTER OF LARRY HARVEY, JR.**

## NOTICE OF INTENT TO INITIATE LITIGATION FOR MEDICAL MALPRACTICE

Pursuant to F.S.A. § 766.106(2), claimant Geraldine Felton and Regina Adams acting as co-guardians (Claimants) (Exhibit 1) on behalf of Larry Harvey, Jr., by and through their attorney, hereby give notice to the parties listed below of their intent to initiate litigation for medical malpractice. Based upon the pre-suit investigation conducted on behalf of Mr. Harvey, and the corroborating declarations by medical doctors qualified to provide such opinions, it is Claimants' intent to file a medical malpractice action against the parties listed below based on the events leading up to Mr. Harvey's cardiorespiratory arrest and subsequent brain damage on December 26th, 1998.

Claimants' names and addresses:

Geraldine Felton
284 Knowlton St.
St. Augustine, FL 32095
(904) 824-4521

Regina Adams
6760 Fielder Road
Rex, GA 30273
(770) 960-9532

On behalf of Larry Harvey. Jr.
Bay View : Samantha Wilson Care Center for Skilled Care
161 Marine St.
St. Augustine, FL 32084
(904) 829-3475

Claimants' attorney:

Joseph D. Lane  Fla. Bar 0954550
Cochran, Cherry, Givens, & Smith
163 West Main
Dothan, AL 36301

This Notice is for the purpose of putting the following potential defendants on notice of Claimants' intent to initiate a medical malpractice action against them:

1.        John Richard Amman
            355 North Boulevard
            St. Augustine, Florida 32095; and

109 Trier Lane
St. Augustine, Florida 32095

2.  Charlotte Ballard
    6894 Pomar Rd.
    St. Augustine, Florida 32086

3.  Vicki Marie Mullins Lovett
    227 Circle Dr. E.
    St. Augustine, Florida 32095

4.  Nurse Karen A. Otis (LPN)
    6892 Sea Place
    St. Augustine, Florida 32086; and

    St. Johns County Sheriff's Department
    4015 Lewis Speedway
    St. Augustine, Florida 32095

5.  Nurse Carol Risden (LPN)
    St. Johns County Sheriff's Department
    4015 Lewis Speedway
    St. Augustine, Florida 32095

6.  Ann E. Dohner Warden (RN)
    401 B Street
    St. Augustine, Florida 32084

7.  Dr. Stanley A. Cohen
    Psychological Services
    236 South Park Circle East
    St. Augustine, Florida 32086

8.  Dr. Michael Tessler
    232 South Park Circle
    St. Augustine, FL  32086

9.  St. Johns County Mental Health Department
    1955 U.S. 1 South
    Suite C-2
    St. Augustine, Florida 32086

10. St. Johns County Sheriff's Department
    3955 Lewis Speedway
    St. Augustine, FL  32095

2

**Case Synopsis:**

On or about September 28th, 1998, Larry Harvey, Jr., was arrested and placed in the St. Johns County Detention Center (SJCDC).  On December 26, 1998 at about 4 PM in the afternoon, Larry Harvey, Jr., was found in his isolation cell, kneeling over his bed at the St. Johns County Detention Center, in St. Augustine, Florida.  He was not breathing at the time and had no heartbeat.  Resuscitation was started and Mr. Harvey's heart was eventually restarted, but he was found to have no brain activity.

On December 26th, 2000, Claimants filed an extension of the Limitation of Action for Medical Malpractice pursuant to F.S.A. § 766.104(2), in the United States Federal District Court for the Middle District of Florida and in the St. Johns County Circuit Court, granting an automatic 90 day extension of the Statute of Limitation to conduct further investigation of this claim (Exhibit 2).  Pursuant to Florida Law, the parties listed above have 90 days in which to conduct an investigation of this matter and provide written responses to these claims as set out below.

Based upon the pre-suit investigation conducted in this matter and the corroborating medical declarations provided with this notice (Exhibit 3 & 4), claimants state that a reasonable basis exists to support a claim for medical malpractice with regards to the medical treatment provided to Larry Harvey, Jr., while he was incarcerated at the St. Johns County Detention Center, in St. Augustine, Florida, from late September through December 26th, 1998.

**Factual Summary of Larry Harvey's Treatment at SJCDC:**

Larry Harvey was incarcerated in the St. Johns County Detention Center on or about September 28th, 1998.  At that time, or shortly thereafter, he was placed on Haldol 5 mg Elixir two times a day along with Cogentin .5 mg every morning and 2 mg at night.  He was kept on this medication in various forms throughout his incarceration.  On October 7th, Mr. Harvey received the first dose of a long acting sustained release preparation of Haldol, called Haldol Deconate.  He would remain on this form of medication in addition to other forms of the Haldol medication at various times up through December 26th.

Mr. Harvey reported symptoms consistent with Haldol adverse effects shortly after being placed on the drug in October and throughout his confinement.  Inmates observed Mr. Harvey's progression from an inmate who was "normal" acting at the beginning of his incarceration to a slow reacting, slow walking, slow speech and "zombie" like state, until December when he was observed to be non-responsive, incontinent, and unable to care for himself.

After complaining of fainting feelings and chest pain, he was evaluated by Dr. Tessler on October 9th and placed on medical watch at that time.  An EKG conducted on October 14th indicated an abnormal change suggestive of inferior lateral left ventricular

ischemia.  Mr. Harvey's lethargy continued and on October 17th he was found unresponsive on the floor of his cell and "would" not speak or get up.

Mr. Harvey endured the adverse effects and extrapyramidal symptoms up through November 20th when the records indicate that Mr. Harvey himself made a written request to have his medication adjusted, i.e., to receive an additional Cogentin injection, which seemed to help him before in October.  He indicated, consistent with inmate witness accounts, that he walked like a "zombie."   There is no record found showing that Mr. Harvey received any adjustment of his Cogentin in response to his request for help.

According to Dr. Cohen's notes, he saw Mr. Harvey again on December 1, 1998. At that time, Dr. Cohen noted that the extrapyramidal symptoms were still present. However, the Haldol and Cogentin were restarted back in the daily dosing form.  Mr. Harvey received 5 oral doses of 10 mg Haldol daily beginning December 1st in addition to still having the remaining Haldol Deconate from the 100 mg injection, given on November 9th, continuing to be released in Mr. Harvey's system.  However, after the morning dose on December 7th, all daily doses of medications, including Cogentin, were stopped by Dr. Cohen.  Mr. Harvey received no further additional medication until December 15th.

The jail records indicate that Mr. Harvey continued to suffer from the effects of the medication after the daily doses were stopped on December 7th.  These records are corroborated by inmate witnesses of Mr. Harvey's condition during this period of time.

Various notes in the record confirm that Mr. Harvey was not getting his meals. The December 14th Inmate Progress Notes indicate that Mr. Harvey did not eat his lunch (consistent with witness statements) and that he "refused to get up."  On December 15th Dr. Tessler (based on the Progress Notes) apparently ordered Mr. Harvey to be moved to a "Sick Cell" for closer observation and to force fluids and place him on a soft diet.  This concern is consistent with the witness statements that Mr. Harvey was unable to eat or drink or take care of himself.

On December 15th, Dr. Cohen phoned in an order to restart Mr. Harvey's Haldol. However, rather than starting the medication back at a low dose, or even the dose previously given (10 mg per day), he ordered that the medication be given by intramuscular injection at a dose of 10 mg immediately and two times a day, a dose twice that of any previously recorded daily dosing for Mr. Harvey. Additionally, Dr. Cohen ordered an injection of Haldol Deconate 75 mg to be given immediately along with a 10 mg injection of Cogentin.  The twice a day Cogentin 2 mg injections and Haldol 10 mg (2 per day) injections continued through December 22nd, at which time all medications were stopped, including any Cogentin that might counteract the adverse effects of the Haldol in Mr. Harvey's system.  By December 22nd, Mr. Harvey had received a total of 15 injections of 10 mg of Haldol (150 mg) in addition to the 75 mg of the slow release Haldol Deconate.

The progress notes for December 15th indicate the severity of Mr. Harvey's condition at the time his Haldol and Cogentin were restarted. Although he was taking some fluids at that time, the Progress Notes also indicate that he was having trouble eating, consistent with witness statements that he was unable to eat. Mr. Harvey's heart rate was found to be markedly elevated consistently throughout December 15th and 16th as well. Additionally, the Progress Notes indicate that Mr. Harvey required assistance on December 17th to go to the toilet, and that he appeared weak. An ECG indicated signs of cardiac ischemia. On December 20th, Dr. Tessler referred Mr. Harvey to a cardiologist. However, the appointment was scheduled for January 5th, 1999. On December 20th, Mr. Harvey was moved back to his isolation cell (Block 15, cell 3A) for the last time. His Haldol daily injections stopped on December 22.

From December 22nd through December 26th, the records are practically void of any indication that Mr. Harvey was being medically monitored for adverse reactions to Haldol in his system. Yet witness statements indicate that he was suffering moderate to severe adverse effects during this time. The Inmate Condition Check reports for December 22nd and 23rd indicate that Mr. Harvey had made a request for medical attention, and that the medical staff was advised of his request. There is no indication in the available records that Mr. Harvey received any response to these documented requests for medical attention on December 22nd, 23rd, or 24th.

On December 25th, the Inmate Condition Check report indicates that Mr. Harvey was so debilitated that he had to have assistance to lie down on his bed, after being given some milk. He had no breakfast. Mr. Harvey was given a single dose of Cogentin 2 mg IM on December 25th after nurse Amman observed him in a withdrawn state, sweating, with hand retractions. The Progress Notes indicate that this provided Mr. Harvey some relief. He received no further treatment until he was found unresponsive the next day, when CPR was started.

The Inmate Condition Check reports for December 20th through December 26th indicate that Mr. Harvey showed virtually no activity at all, consistent with the Witness statements. He was merely seen lying on his bed almost the entire time from December 20th through December 26th until about 12:30 PM on December 26th. At that time he was observed on the floor, "kneeling" beside his bed, and was found about 4 hours later in the same position, unconscious, and without respiration or pulse.

The inmate witnesses consistently reported that Mr. Harvey experienced a steady decline during his incarceration especially in the month of December. Some witnesses observed Larry slobbering or drooling at the mouth, walking very slowly and with a shuffling gait, matted eyes, zombie-like, hollow-eyed, motionless, shaking, staring into space (fixed stare), with significant weight loss, weakness to the point he could not walk, back muscle rigidity ("stiff as a two-by-four"), and at times profuse sweating, slowed speech, mumbling, and non-responsiveness. Even the nursing staff and Correctional Officers confirmed Mr. Harvey's inability to verbally respond to their comments in the last days of his incarceration, stating that Mr. Harvey would not respond or would mumble incoherently. Other witnesses saw Larry fall while trying to walk, zombie-like

and shaking all over. Some witnesses described how Mr. Harvey was handcuffed with his left arm and leg against the wall, unable to move, and how the food tray was placed on his chest, yet because of weakness and severe shaking he was unable to eat or drink.

## CONCLUSIONS:

It is claimants' position, as supported by the attached corroborating declarations, that in the month of December, Mr. Harvey was in a severely sedated state and was suffering ongoing adverse reactions from the previous regimen of medication from December 1st through December 7th. When the medication was started back on December 15th, Mr. Harvey was still experiencing marked extrapyramidal effects consistent with Haldol toxicity. The 75 mg Haldol Deconate injection given on December 15th combined with the two times a day injections of 10 mg Haldol further compounded the problem. By the time the daily injections stopped on December 22nd, Mr. Harvey had accumulated significant amounts of Haldol. Consequently, after December 22nd, Mr. Harvey continued to experience increasing levels of the adverse effects of the Haldol, that were significantly enhanced due to the absence of any further Cogentin to counter some of the effects.

It is Claimants' contention that Mr. Harvey was suffering from Haldol toxicity and that the failure to adequately monitor and address the adverse effects of the Haldol was the direct cause of Mr. Harvey's deteriorating mental and physical condition, shakiness and inability to eat or drink or care for himself. Claimants further contend that Mr. Harvey's overmedication was the underlying cause for his cardiorespiratory arrest and subsequent hypoxic brain damage and vegetative state.

Claimants contend that these medical caregivers failed to meet prevailing professional standards of care. As a result of these failures on the part of the medical staff and parties listed above to meet acceptable standards of care, Mr. Harvey suffered cardiorespiratory arrest and subsequent hypoxic brain damage and vegetative state. As a result, Mr. Harvey has incurred enormous costs associated with health care and will continue to incur costs for medical treatment for the rest of his life. In his comatose state, he has obviously lost his ability to enjoy life experiences and there is no indication that he will regain consciousness at this time.

Again, it is Claimants' position that a reasonable basis exists to support a claim for medical malpractice with regards to the medical treatment provided to Larry Harvey, Jr., while he was incarcerated at the St. John's County Detention Center from late September through December 26th of 1998. Claimants intend to file a medical malpractice action based on these claims pursuant to Florida Law.

Submitted and served on each of the above named parties, by United States Postal Service Certified Mail, return receipt requested, this the 26th day of March, 2001.

LAW OFFICES OF COCHRAN,
CHERRY, GIVENS & SMITH


Joseph D. Lane
**Attorneys for Claimants**


**JOSEPH D. LANE, ESQ. (FSBN 0954550)**
**COCHRAN, CHERRY, GIVENS & SMITH, P.C.**
**163 West Main Street**
**P. O. Box 927**
**Dothan, Alabama  36302**
**Telephone:  (334) 793-1555**
**Facsimile:  (334) 793-8280**

7

EXHIBIT 1

IN THE CIRCUIT COURT FOR THE SEVENTH JUDICIAL CIRCUIT
ST. JOHNS COUNTY, FLORIDA

IN RE:  GUARDIANSHIP OF                    PROBATE DIVISION

    LARRY HARVEY, JR.                       CASE NO.: *CPPP-432*

                                      DIVISION: *55*

## LETTERS OF GUARDIANSHIP
## OF THE PERSON AND PROPERTY

**TO WHOM IT MAY CONCERN:**

    **WHEREAS, GERALINE FELTON** and **REGINA ADAMS** have been appointed the co-guardians of the person, property and estate of **LARRY HARVEY, JR.** (the Ward), and has taken the prescribed oath and performed all other acts prerequisite to issuance of letters of guardianship of the person, property and estate.

    **NOW, THEREFORE, I,** the undersigned Judge of the above entitled court, declare **GERALINE FELTON** and **REGINA ADAMS** duly qualified under the laws of the State of Florida to act as the co-guardians of **LARRY HARVEY, JR.**, (the Ward), with full power to have the care, custody and control of the Ward, to exercise all delegable legal rights and powers of the Ward, to administer the estate of the Ward according to law, and to take possession of and to hold, for the benefit of the Ward, all the property of the Ward, and of all the rents, income, issues and profits from it.

    ORDERED this ___*19*___ day of ___*JAN*___, 2000.

                                  /s/ RICHARD G. WEINBERG
                                  CIRCUIT JUDGE

cc:  Angela J. Mason, Esq.
     Robin H. Conner, Esq.



**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

In re:  LARRY HARVEY, Jr.,        )
                                     )

v.                                )
                                   )

ST. JOHNS COUNTY SHERIFF'S    )
DEPARTMENT AND OTHERS       )
                                 )    Civil Action No. _____
                                 )
                                 )

**PETITION TO THE CLERK OF THE UNITED STATES DISTRICT COURT**
**FOR MIDDLE DISTRICT OF FLORIDA  FOR EXTENSION OF STATUTE OF**
**LIMITATIONS PURSUANT TO FLORIDA STATUTE 766.104(2).**

Come now Petitioners, by and through their undersigned counsel, and submit their

petition for an automatic extension of the statute of limitations in the matter described

above and below pursuant to Florida Statute § 766.104(2).  See attached.  As a basis for

this petition, Petitioners state the following:

1.     This matter concerns potential medical negligence claims against various St.

        Johns County Sheriff's Department employees and/or agents or

        subcontractors, the identity of which has not been fully made at this time, but

        who are subject to the Medical Negligence pre-suit requirements under

        Chapter 766 of the Florida Statutes, and are subject to the two-year statute of

        limitations for Medical Negligence actions pursuant to Florida Statute 95.11,

        and the 90 extension of the two year statute of limitation allowed pursuant to §

        766.104(2).

2.     Petitioners assert that this Court will have jurisdiction over this matter since Mr. Harvey was denied proper medical treatment under circumstances warranting such treatment and that this fact and others will support a Federal Question claim arising out of 42 U.S.C § 1983.

3.     Larry Harvey, Jr., is and was a resident of St. Johns County, Florida at all times material to this matter.  Larry Harvey is mentally incompetent to handle his own affairs.  Mr. Harvey's Social Security number is 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.  Mr. Harvey was born March 25, 1973, and is currently 27 years old.  He is currently a long term patient at Bayview-Samantha Wilson Care Center, in St. Augustine, St. Johns County, Florida.  Mr. Harvey, in light of his comatose condition, is incapable of executing any of the rights enumerated in section 744.3215, Fla. Stat.

4.     The potential medical negligence claims arose out of injuries and damages which Mr. Harvey sustained while incarcerated in jail in St. Johns County, Florida.

5.     Petitioners, who will be named parties to suit in this matter do not yet know the identities of all parties who might be named as defendants in claims which may fall under Florida's pre-suit medical negligence requirements as set out in Florida Statutes § 766.106, and related statutes.

6.     Co-Petitioner, Geraline Felton, is 48 years old, and resides at 284 Knowlton St., St. Augustine, in St. Johns County, in the state of Florida.  Petitioner is the natural mother of the Ward, Larry Harvey, Jr., and has been duly appointed to serve as plenary co-guardian of Larry Harvey, Jr.  See attached.

7.      Co-Petitioner, Regina Adams is the natural half-sister of Larry Harvey, Jr., resides in Douglas, Georgia, and owns property in St. Johns County, Florida, and has been duly appointed to serve as plenary co-guardian of Larry Harvey, Jr. See attached.

8.      This case involves potential medical negligence of Larry Harvey, Jr., who during all relevant times to this action, was incarcerated in the St. John County Jail in St. Augustine, Florida. On December 26, 1998, Larry Harvey, Jr., while still incarcerated, and in the custody and care of the St. Johns County Sheriff's Department, was found unconscious in his jail cell. At that time, Mr. Harvey had been in jail for approximately three months during which time, he was being given various medications purportedly for the treatment of mental disorders. Ultimately, it was presumed that Mr. Harvey suffered some type of medical event which culminated in full respiratory arrest and subsequent brain damage and resulted in his complete incompetence. He remains in a vegetative state to this date.

9.      As a result of Mr. Harvey's incompetence, Petitioners Geraline Felton and Regina Adams were appointed guardians and conservators over Mr. Harvey and his affairs with complete rights and duties with regards to all actions to be taken on his behalf.

10.      Pursuant to Florida Statute 95.11, the Statute of Limitations for the above potential medical negligence claims would run on December 26, 2000.

11.      The automatic 90-day extension of above stated statute of limitation would place the extended limitation of action on March 26, 2001.

Wherefore, Petitioners/Guardians of Larry Harvey, Jr., hereby submit this Petition for the automatic 90-day extension allowed for this potential medical negligence claim for additional time to complete the reasonable pre-suit investigation as contemplated and set out in Chapter 766 of the Florida Statutes.

Respectfully submitted this the 22nd day of December, 2000.

LAW OFFICES OF COCHRAN,
CHERRY, GIVENS & SMITH

JOSEPH D. LANE, ESQ.
Attorney for Petitioners

JOSEPH D. LANE, ESQ. (FSBN 0954550)
COCHRAN, CHERRY, GIVENS & SMITH, P.C.
163 West Main Street
P.O. Box 927
Dothan, Alabama 36302
Telephone: (334) 793-1555
Facsimile: (334) 793-8280

Florida Statute **766.104  Pleading in medical negligence cases; claim for punitive damages.--**

(1)  No action shall be filed for personal injury or wrongful death arising out of medical negligence, whether in tort or in contract, unless the attorney filing the action has made a reasonable investigation as permitted by the circumstances to determine that there are grounds for a good faith belief that there has been negligence in the care or treatment of the claimant. The complaint or initial pleading shall contain a certificate of counsel that such reasonable investigation gave rise to a good faith belief that grounds exist for an action against each named defendant. For purposes of this section, good faith may be shown to exist if the claimant or his or her counsel has received a written opinion, which shall not be subject to discovery by an opposing party, of an expert as defined in s. 766.102 that there appears to be evidence of medical negligence. If the court determines that such certificate of counsel was not made in good faith and that no justiciable issue was presented against a health care provider that fully cooperated in providing informal discovery, the court shall award attorney's fees and taxable costs against claimant's counsel, and shall submit the matter to The Florida Bar for disciplinary review of the attorney.



(2)  Upon petition to the clerk of the court where the suit will be filed and payment to the clerk of a filing fee, not to exceed $25, established by the chief judge, an automatic 90-day extension of the statute of limitations shall be granted to allow the reasonable investigation required by subsection (1). This period shall be in addition to other tolling periods. No court order is required for the extension to be effective. The provisions of this subsection shall not be deemed to revive a cause of action on which the statute of limitations has run.

**History.--**s. 12, ch. 85-175; s. 68, ch. 86-160; s. 8, ch. 86-287; s. 71, ch. 95-211; s. 1151, ch. 97-102.

RECEIPT FOR PAYMENT
DISTRICT COURT OF MIDDLE
FLORIDA
JACKSONVILLE DIVISION

J003356

RECEIVED FROM:

COCHRAN, CHERRY, GIVENS &
SMITH, P.C.
P.O. BOX 927
DOTHAN, AL 36302

Case Number: 3:00CV01370

F/U/B/O:

Party ID:

Tender Type:          CHECK
01-086900                      $60.00

Civil Filing-086900

Remarks:

01-510000                      $90.00

Civil Filing-510000

Remarks:

Subtotal:          $150.00

Receipt Total:          $150.00

* Checks and drafts are accepted
subject to collections and full
credit will only be given when
the check or draft has been
accepted by the financial
institution on which it was drawn.

Date: 12/26/00
Clerk: _E Edward_

EW

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. ~~to~~ complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Received by (Please Print Cle    B. Date of L

C. Signature

X _Elke Ward_    ☒ Ag
☐ Add

D. Is delivery address different from item 1?    ☐ Yes
If YES, enter delivery address below:    ☐ No

1. Article Addressed to:

Clerk, US District Court
Middle District of Florida
U.S. Courthouse
311 W. Monroe St., Ste. 110
Jacksonville, Fl 32202

3. Service Type
☒ Certified Mail    ☐ Express Mail
☐ Registered    ☐ Return Receipt for Merch
☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Ar
7(

PS F

102595-99-

## IN THE CIRCUIT COURT OF ST. JOHNS COUNTY, FLORIDA

In re:  LARRY HARVEY, Jr.,                )
                                          )
v.                                        )
                                          )
ST. JOHNS COUNTY SHERIFF'S                )
DEPARTMENT AND OTHERS                     )
                                          )        Civil Action No. _____
                                          )
                                          )

### PETITION TO THE CLERK OF THE CIRCUIT COURT OF ST. JOHNS COUNTY FOR EXTENSION OF STATUTE OF LIMITATIONS PURSUANT TO FLORIDA STATUTE 766.104(2).

Come now Petitioners, by and through their undersigned counsel, and submit their petition for an automatic extension of the statute of limitations in the matter described above and below pursuant to Florida Statute § 766.104(2).  See attached.  As a basis for this petition, Petitioners state the following:

1.    This matter concerns potential medical negligence claims against various St. Johns County Sheriff's Department employees and/or agents or subcontractors, the identity of which has not been fully made at this time, but who are subject to the Medical Negligence pre-suit requirements under Chapter 766 of the Florida Statutes, and are subject to the two-year statute of limitations for Medical Negligence actions pursuant to Florida Statute 95.11, and the 90 extension of the two year statute of limitation allowed pursuant to § 766.104(2).

2.    Larry Harvey, Jr., is and was a resident of St. Johns County, Florida at all times material to this matter.  Larry Harvey is mentally incompetent to handle

his own affairs. Mr. Harvey's Social Security number is 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. Mr. Harvey was born March 25, 1973, and is currently 27 years old. He is currently a long term patient at Bayview-Samantha Wilson Care Center, in St. Augustine, St. Johns County, Florida. Mr. Harvey, in light of his comatose condition, is incapable of executing any of the rights enumerated in section 744.3215, Fla. Stat.

3.    The potential medical negligence claims arose out of injuries and damages which Mr. Harvey sustained while incarcerated in jail in St. Johns County, Florida.

4.    Petitioners, who will be named parties to suit in this matter do not yet know the identities of all parties who might be named as defendants in claims which may fall under Florida's pre-suit medical negligence requirements as set out in Florida Statutes § 766.106, and related statutes.

5.    Co-Petitioner, Geraline Felton, is 48 years old, and resides at 284 Knowlton St., St. Augustine, in St. Johns County, in the state of Florida. Petitioner is the natural mother of the Ward, Larry Harvey, Jr., and has been duly appointed to serve as plenary co-guardian of Larry Harvey, Jr. See attached.

6.    Co-Petitioner, Regina Adams is the natural half-sister of Larry Harvey, Jr., resides in Douglas, Georgia, and owns property in St. Johns County, Florida, and has been duly appointed to serve as plenary co-guardian of Larry Harvey, Jr. See attached.

7.    This case involves potential medical negligence of Larry Harvey, Jr., who during all relevant times to this action, was incarcerated in the St. John

County Jail in St. Augustine, Florida. On December 26, 1998, Larry Harvey, Jr., while still incarcerated, and in the custody and care of the St. Johns County Sheriff's Department, was found unconscious in his jail cell. At that time, Mr. Harvey had been in jail for approximately three months during which time, he was being given various medications purportedly for the treatment of mental disorders. Ultimately, it was presumed that Mr. Harvey suffered some type of medical event which culminated in full respiratory arrest and subsequent brain damage and resulted in his complete incompetence. He remains in a vegetative state to this date.

8.   As a result of Mr. Harvey's incompetence, Petitioners Geraline Felton and Regina Adams were appointed guardians and conservators over Mr. Harvey and his affairs with complete rights and duties with regards to all actions to be taken on his behalf.

9.   Pursuant to Florida Statute 95.11, the Statute of Limitations for the above potential medical negligence claims would run on December 26, 2000.

10.   The automatic 90-day extension of above stated statute of limitation would place the extended limitation of action on March 26, 2001.

Wherefore, Petitioners/Guardians of Larry Harvey, Jr., hereby submit this Petition for the automatic 90-day extension allowed for this potential medical negligence claim for additional time to complete the reasonable pre-suit investigation as contemplated and set out in Chapter 766 of the Florida Statutes.

Respectfully submitted this the 22nd day of December, 2000.

LAW OFFICES OF COCHRAN,
CHERRY, GIVENS & SMITH

JOSEPH D. LANE, ESQ.
**Attorney for Petitioners**


JOSEPH D. LANE, ESQ. (FSBN 0954550)
COCHRAN, CHERRY, GIVENS & SMITH, P.C.
163 West Main Street
P.O. Box 927
Dothan, Alabama 36302
Telephone: (334) 793-1555
Facsimile: (334) 793-8280

IN THE CIRCUIT COURT FOR THE SEVENTH JUDICIAL CIRCUIT
ST. JOHNS COUNTY, FLORIDA

IN RE:  GUARDIANSHIP OF                PROBATE DIVISION

LARRY HARVEY, JR.                     CASE NO.: *CPPP-432*

                                      DIVISION: *55*


## LETTERS OF GUARDIANSHIP
## OF THE PERSON AND PROPERTY

**TO WHOM IT MAY CONCERN:**

WHEREAS, GERALINE FELTON and REGINA ADAMS have been
appointed the co-guardians of the person, property and estate of
LARRY HARVEY, JR. (the Ward), and has taken the prescribed oath
and performed all other acts prerequisite to issuance of letters
of guardianship of the person, property and estate.

NOW, THEREFORE, I, the undersigned Judge of the above
entitled court, declare GERALINE FELTON and REGINA ADAMS duly
qualified under the laws of the State of Florida to act as the
co-guardians of LARRY HARVEY, JR., (the Ward), with full power to
have the care, custody and control of the Ward, to exercise all
delegable legal rights and powers of the Ward, to administer the
estate of the Ward according to law, and to take possession of
and to hold, for the benefit of the Ward, all the property of the
Ward, and of all the rents, income, issues and profits from it.

ORDERED this ___*19*___ day of ___*JAN*___, 2000.


                                      /s/ RICHARD G. WEINBERG
                                      _____
                                      CIRCUIT JUDGE


cc:  Angela J. Mason, Esq.
     Robin H. Conner, Esq.

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

*COMPLETE THIS SECTION ON DELIVERY*

A. Received by (Please Print Clearly)    B. Date of

C. Signature
X                                        □ Ac
                                         □ Ad

D. Is delivery address different from item 1?    □ Ye
If YES, enter delivery address below:            □ No

1. Article Addressed to:

Clerk of Court
St. Johns County
4010 Lewis Speedway
St. Augustine, Fl 32084

3. Service Type
   □ Certified Mail    □ Express Mail
   □ Registered        □ Return Receipt for Merc'
   □ Insured Mail      □ C.O.D.

4. Restricted Delivery? (Extra Fee)    □ Yes

2.

PS                                              102595-99-

EXHIBIT 3

**In re MATTER OF LARRY HARVEY, JR.**

## CORROBORATING MEDICAL OPINION OF
## OLLE KJELLGREN, M.D.

My name is Olle Kjellgren.  I am a medical doctor specializing in Clinical Cardiovascular Medicine at Memorial Medical Center in New Orleans, LA.  I am duly and regularly engaged in the practice of my profession as a clinical cardiologist.  I hold a medical degree from Karolinska Institute, Stockholm, Sweden.  I am licensed to practice medicine in Louisiana, Texas, and New York.  As a clinical cardiologist, I have special health care knowledge and skill about the matter addressed below and for which I am providing an opinion.  I have never had a medical opinion disqualified by a court of law. My CV is attached to this Declaration for reference.

**Case Synopsis:**

On December 26, 1998, at about 4 PM in the afternoon, Larry Harvey, Jr., was found in his isolation cell in the St. Johns County Detention Center, crouched beside his bed.  He was not breathing at the time and had no heartbeat.  Resuscitation was started at that time and Mr. Harvey's heart was eventually restarted, but he was found to have no brain activity.

**Primary Opinion:**

Based upon my review of the materials decribed below, it is my opinion stated within a reasonable degree of medical probability that a reasonable basis exists to support a claim for medical malpractice with regards to the medical treatment provided to Larry Harvey, Jr., while he was incarcerated at the St. Johns County Detention Center, in St. Augustine, Florida, from late September through December 26th, 1998.

**Factual Basis for Opinion:**

In forming these opinions, I have reviewed the medical records describing the treatment provided Larry Harvey, Jr., while he was incarcerated at the St. Johns County Detention Center.  I have also reviewed nine recorded statements taken from inmates who were present and observed Mr. Harvey to varying degrees throughout his incarceration from September 29th through December 26th.  I have also reviewed Inmate Condition Check reports specific for Mr. Harvey, and the Office Notes of Dr. Stanley A. Cohen. I have also reviewed several Affidavits from jail personnel and nursing staff who saw Mr. Harvey in the last days of his incarceration.  I also have reviewed some background material on the adverse effects of medications such as those being administered to Mr. Harvey at the St. Johns County Detention Center, and I have relied on my years of experience and training in medicine with regards to expected national standards of care.

1

**Factual Summary:**

Based on the statements taken from inmates, many of which saw Mr. Harvey on a daily basis as they brought the food tray to his cell even when he was in isolation, Mr. Harvey was described by these witnesses as a man that was initially active, talking and interacting with other inmates as well as playing basketball and cards with other inmates. However, after having received ongoing doses of oral and parenteral (medications by injections), including haloperidol or Haldol (phenothiazine preparations) against his will, Mr. Harvey began a slow progression of significant side effects including severe sedation, weakness, and other extrapyramidal effects. The jail records indicate Mr. Harvey was receiving Haldol in some form from October 1st through December 22nd. It appears from all available records and witness interviews that Mr. Harvey continued to experience significant medication toxicity through December 26th.

**Summary of Treatment:**

The Jail records indicate that on or about the time Mr. Harvey was incarcerated, (about September 28th) he was being given Haldol 5 mg Elixer two times a day along with Cogentin .5 mg every morning and 2 mg at night. However, Mr. Harvey refused several doses of his medication on October 1st through October 3rd complaining that the medication made his heart hurt. On October 7th, Mr. Harvey's Haldol was changed to a long acting slow release preparation, called Haldol Deconate. He received his first 100 mg injection of this preparation on October 7th AM. His Cogentin medication was changed to as needed dosing. Witness statements describing Mr. Harvey's mental and physical condition during this period indicate that he began exhibiting signs of sedation, slow reaction, slow talking and slow movements. The Inmate Progress Notes for October 9th indicate that Mr. Harvey began to experience marked sedation and extrapyramidal symptoms, reporting a fainting incident on October 9th and chest pain. He was evaluated by Dr. Tessler on October 9th and placed on medical watch at that time.

An EKG conducted on October 14th indicated an abnormal change suggestive of inferior lateral left ventricular ischemia. His lethargy continued and on October 17th he was found unresponsive on the floor of his cell and would not speak or get up. On October 20th, Dr. Cohen changed his PRN Cogentin to 2mg BID after a 2 mg IM dose was given immediately.

Mr. Harvey apparently improved some after his Cogentin was restarted on a scheduled basis although he was still experiencing significant extrapyramidal symptoms. On November 3rd Dr. Cohen saw Mr. Harvey and noted the extrapyramidal symptoms including choreiform tongue movements and lip tremors. Consequently, Dr. Cohen ordered the Haldol Deconate (long acting sustained release) injection dosing reduced to 75 mg IM per month starting on November 9th and continuing the Cogentin 2 mg orally two times a day. He also noted Mr. Harvey's inability to sleep and prescribed trazodone 75 every night (although this was not noted in his Office notes). Although the Cohen prescription and the MAR indicated that the November 9th dose of Haldol Deconate was

2

to be 75 mg, it appears from the Inmate Progress Notes that 100 mg of the Deconate was given on November 9th.

Mr. Harvey endured the adverse effects and extrapyramidal symptoms up through November 20th when the records indicate that Mr. Harvey made a written request to have his medication adjusted, i.e., to receive a Cogentin injection, which seemed to help him before in October. He indicated, consistent with inmate witness accounts that he walked like a "zombie." There is no record found showing that Mr. Harvey received any adjustment of his Cogentin in response to his request for help.

According to Dr. Cohen's notes, he saw Mr. Harvey again on December 1, 1998. At that time, Dr. Cohen noted that the extrapyramidal symptoms were still present. Because Larry apparently indicated he did not want to endure another dose of the Haldol Deconate (long acting injection preparation), Dr. Cohen changed his Haldol Deconate to Haldol 10 mg tablets every night along with Cogentin 2 mg tablets twice a day and trazodone 75 mg every night. The Haldol 10 mg dose was begun on December 1st. Mr. Harvey, consistent with witness statements of his concerns of progressing to a zombie like state, refused to take the December 5th PM dose of Cogentin, Haldol and trazodone. On December 7th, Dr. Cohen was notified of Mr. Harvey's missed December 5th PM doses and called in an order to discontinue all of Mr. Harvey's medications. After his December 7th AM dose of Cogentin, Mr. Harvey received no further additional medication until December 15th.

The Inmate Progress Notes for December 10th note that Mr. Harvey was found passed out on the floor of his cell. He was apparently moved to "Sick Cell" 27 4-A for observation. He was noted to have eaten very little of his breakfast on December 11th and that he was very unstable on his feet (see Inmate Condition Check report). Later on in the morning of December 11th he was moved back to isolation. Although Mr. Harvey was restrained most of the time (as indicated by the Inmate Condition Check reports), when he was released temporarily, he was noted to have been very unstable, falling backwards and almost hitting his head on the door jamb. On December 13th, Mr. Harvey noted to be very unresponsive in the morning and evening.

Various notes in the record confirm that Mr. Harvey was not receiving nourishment. The December 14th Inmate Progress Notes indicate that Mr. Harvey did not eat his lunch (consistent with witness statements) and that he "refused to get up." On the morning of December 15th Mr. Harvey was noted to have been unresponsive, and "would not move." He was placed in the shower and later moved (based on the Progress Notes and Inmate Condition Check report) to a "Sick Cell" for closer observation and to force fluids and place him on a soft diet. This concern is consistent with the witness statements that Mr. Harvey was unable to eat or drink or take care of himself.

Also, on December 15th, Dr. Cohen phoned in an order to restart Mr. Harvey's Haldol immediately. However, the dose was increased from the previous 10 mg oral dose per day to 20 mg IM injections divided in two doses per day. Additionally, Dr. Cohen ordered an injection of Haldol Deconate 75 mg to be given immediately along

with a 10 mg injection of Cogentin. The twice a day Cogentin 2 mg injections and Haldol 10 mg (2 per day) injections continued through December 22nd, at which time all medications were stopped.

On December 16th, an EKG was performed and showed abnormalities suggestive of possible anteriolateral ventricular ischemia and inferior ventricular ischemia. Mr. Harvey's heart rate was found to be consistently elevated on December 15th and 16th as well. The Progress Notes indicate that Mr. Harvey required assistance on December 17th to go to the toilet, and that he appeared weak.

On December 20th, Dr. Tessler referred Mr. Harvey to a cardiologist. However, the appointment was for January 5th, 1999. Also, on December 20th, Mr. Harvey was moved back to his isolation cell (Block 15, cell 3A) for the last time. His Haldol and Cogentin injections stopped on December 22. From December 20th through December 26th, the Inmate Condition reports indicate virtually no activity at all on the part of Mr. Harvey, consistent with Witness statements. He was merely seen laying on his bed almost the entire time from December 20th through noon on December 26th.

The witness statements I have reviewed provided further insight into the severe adverse effects the medications were having on Mr. Harvey. They consistently reported that Mr. Harvey experienced a steady decline especially in the month of December. Wendell Rogers described Mr. Harvey as steadily declining from the end of November from someone who was obviously on medication but still somewhat coherent to an almost vegetable state. Larry Calloway states that when he first saw Larry Harvey in the second week of November, Mr. Harvey was still able to function for the most part up through the end of November. Then later when Mr. Calloway saw Larry in isolation on numerous occasions in December, he was shackled to his bunk and appeared non-responsive, showing no movement at any time.

Other witnesses described Mr. Harvey's earlier slow decline as early as October. Darren Williams described Mr. Harvey as being fine at the end of September or early October, but later on in the month, he noticed that on the basketball court, Mr. Harvey could not function or move like he normally would move. His movements were very slow and he exhibited emotionless facial expressions. He says that Mr. Harvey could talk at that time, but he could not make any quick movements. In December, Mr. Williams observed Mr. Harvey in a much more deteriorated condition. Mr. Williams stated that he observed medical personnel giving Mr. Harvey his injections of the medication even when he was unable to respond to them. He observed Mr. Harvey just laying on his bed and "shaking real bad." At that time, Mr. Williams observed that Mr. Harvey was so weak he could not resist the giving of the injections. This period is probably during the December 15th through December 22nd medication period. At one point, Mr. Williams saw the guards carrying Mr. Harvey back to the infirmary from his isolation cell, not long before his final collapse. He described how Mr. Harvey was obviously incontinent. He described how he could see and smell the defecation and urine on Mr. Harvey while Mr. Harvey was in isolation.

4

Mr. Williams observed how Mr. Harvey was unable to eat or drink on his own on many occasions when he observed him in the month of December in isolation. And Mr. Williams observed how Mr. Harvey appeared to be dehydrated and malnourished during the last days in isolation.

Other witnesses confirmed these statements to a large extent and provided additional evidence of other adverse drug effects from the Haldol. Some witnesses observed Larry slobbering or drooling at the mouth, walking very slow and with a shuffling gait, matted eyes, zombie like, hollow eyed, motionless, shaking, staring into space (fixed stare), with significant weight loss, weakness to the point he could not walk, back muscle rigidity ("stiff as a two-by-four") and at times profuse sweating, slowed speech, mumbling and ultimately non-responsive verbally. Even the nursing staff and Correctional Officers confirmed Mr. Harvey's inability to verbally respond to there comments to his in the last days of his incarceration. Other witnesses saw Larry fall while trying to walk, zombie like and shaking all over. Some witnesses described how Mr. Harvey was handcuffed with his left arm and leg against the wall, unable to move, and how the food tray was placed on his chest, yet because of weakness and severe shaking he was unable to eat or drink.

**Medication Background Information:**

Acute toxicity: It is well documented in the medical literature that, overdosage of phenothiazines may be expected to produce effects that are extensions of common adverse reactions; severe extrapyramidal reactions, hypotension, and sedation, tachycardia, ECG changes and cardiac arrhythmias, hypothermia, miosis, tremor, muscle twitching, spasm or rigidity, seizures, muscular hypotonia, dry mouth, difficulty in swallowing or breathing, cyanosis, and respiratory and/or vasomotor collapse, possibly with sudden apnea. With Haldol, coma with respiratory depression and hypotension (sometimes shock-like) may occur. Of course, manifestations of overdosage with Haldol Deconate injection may be prolonged. Section 28:16.08, American Hospital Formulary Service, Drug Information, 1987.

Because of these possibly severe adverse effects, and because dosage requirements for phenothiazines can vary over a wide rage, the dosage must be carefully adjusted to individual requirements and response, using the lowest possible effective dosage. Id.

Extrapyramidal reactions are common with administration of Haldol, including marked drowsiness and lethargy, drooling or hypersalivation and fixed stare, and are generally dose related, but can usually be treated with medications such as Cogentin. However, when concomitant therapy with medication such as Cogentin is necessary to manage Haldol induced extrapyramidal symptoms, it may be necessary to continue the Cogentin for a period of time after discontinuation of the Haldol in order to prevent the emergence of the symptoms. Because of the significant risk associated with the use of Haldol, close clinical observation is required during dosage titration in order to minimize the risk of overdosage.

5

## CONCLUSIONS:

Based upon my review of the above referenced materials it is my opinion stated within a reasonable degree of medical probability that Mr. Larry Harvey was suffering from medication toxicity during December, 1998. It is my further opinion stated within a reasonable degree of medical probability that the overmedication was the direct cause of Mr. Harvey's deteriorating mental and physical condition, shakiness and inability to eat or drink or care for himself. It is further my opinion stated within a reasonable degree of medical probability that Mr. Harvey's overmedication was the underlying cause for his cardiorespiratory arrest and subsequent hypoxic brain damage and vegetative state.

### Deviations from the Standard of Care:

It is my further opinion, stated within a reasonable degree of medical probability that the standard of care was not met in this case in at least the following ways:·

1.    Failure on the part of Dr. Cohen and Dr. Tessler to adequately recognize, assess and address the significant adverse drug effects that resulted in Mr. Harvey's severe mental and physical deterioration.

2.    Failure of nursing staff to properly monitor, observe and address significant drug toxicity and adverse reactions Mr. Harvey was experiencing.

3.    Failure of doctors and nursing staff to take precautions due to dehydration of patient resulting from his deteriorated condition and to increase monitoring of the patient who was obviously weak, lethargic, and non-responsiveness, resulting in further malnutrition and dehydration.

4.    Failure on the part of the administration of the medical department to have adequate procedures in place to adequately address the situation where an inmate is obviously in significant distress from overmedication.

Again, it is my opinion stated within a reasonable degree of medical probability that a reasonable basis exists to support a claim for medical malpractice with regards to the medical treatment provided to Larry Harvey, Jr., while he was incarcerated at the St. John's County Detention Center, St. Augustine, Florida, from late September through December 26th of 1998. It is my opinion, stated within a reasonable degree of medical probability that Mr. Harvey's cardiorespiratory arrest and subsequent hypoxic brain damage and vegetative state was a direct result of the failures on the part of the medical caregivers to meet the standards of care listed above.

Under penalties of perjury, I declare that I have read the foregoing 6 pages and that the facts stated in it are true, dated this the 25th day of March, 2001.

Dr. Olle Kjellgren

6

# CURRICULUM VITAE

## Olle Kjellgren, M.D.

2633 Napoleon Avenue, Suite 500
New Orleans, Louisiana 70115-6306

Phone: (504) 897-9686
Facsimile: (504) 899-9461

### POSTTRAINING EXPERIENCES

| | |
|---|---|
| 1995 - present | Memorial Medical Center, New Orleans, Louisiana<br>Private Practice in Interventional and Clinical Cardiovascular Medicine |

### POSTDOCTORAL TRAINING

| | |
|---|---|
| 1994 - 1995 | The University of Texas Medical School and<br>Hermann Hospital at Texas Medical Center, Houston, Texas<br>Fellowship in Interventional Cardiology |
| 1991 - 1994 | Beth Israel Medical Center and The Mount Sinai School of Medicine,<br>New York, New York<br>Fellowship in Cardiology |
| 1991 - 1994 | The Mount Sinai Medical Center and The Mount Sinai School of Medicine,<br>Electrophysiology Section, New York, New York<br>Research Associate |
| 1988 - 1991 | St. Luke's Roosevelt Hospital Center and Columbia University,<br>New York, New York<br>Internship and Residency in Internal Medicine |
| 1987 - 1988 | Kristinehamn Hospital, Kristinehamn, Sweden<br>Internship in Medicine and Surgery |

### EDUCATION

| | |
|---|---|
| 1982 - 1987 | Karolinska Institutet, Stockholm, Sweden<br>M.D. Degree |
| 1987 | Vanderbilt University, Nashville, Tennessee<br>Visiting Medical Student |
| 1978 - 1981 | Skanstulls Gymnasium, Stockholm, Sweden<br>B.A. in Natural Sciences |

## CERTIFICATION & LICENSURE

| | |
|---|---|
| 1995 | The American Board of Cardiovascular Diseases, #137363 |
| 1995 | Louisiana State License, #11239R |
| 1994 | Texas State License, #J6147 |
| 1992 | New York State License, #188696 |
| 1991 | The American Board of Internal Medicine, #137363 |
| 1989 | FLEX |
| 1987 | ECFMG, #397-917-6 |

## PROFESSIONAL SOCIETIES

American College of Cardiology

American College of Physicians

Lousiana State Medical Society

## HONORS & AWARDS

| | |
|---|---|
| 1993 | Beth Israel Medical Center Housestaff Research Competition Awarded First Prize |

## PARTICIPATION IN MULTICENTER TRIALS

| | |
|---|---|
| 1995 | TLC C-53 (*TLC C-53 versus placebo with tPA in Acute Myocardial Infaction*) Sub-Investigator |
| 1995 | EPILOGUE (*c7E3 versus Heparin in Patients Undergoing PTCA*) Sub-Investigator |
| 1994 - 1995 | SAVED (*Stenting versus PTCA of Saphenous Vein Grafts*) Sub-Investigator |
| 1994 - 1995 | TIMI 9 (*Hirudin versus Heparin in Acute Myocardial Infarction*) Sub-Investigator |
| 1994 - 1995 | MK 383 Study (*MK-383 versus Heparin in Acute Coronary Syndromes*) Sub-Investigator |
| 1994 - 1995 | ENDPT (*Value of Doppler Indices in Patients Undergoing PTCA*) Sub-Investigator |

| 1994 - 1995 | CRAC ("Compliant" versus "Noncompliant" Balloons in Elective Angioplasty)<br>Sub-Investigator |
|---|---|
| 1994 | RAPID 2 (r-PA versus t-PA in Acute Myocardial Infarction)<br>Sub-Investigator |
| 1993 - 1994 | Hirulog Study (Hirulog versus Heparin in Patients with Unstable Angina Undergoing PTCA)<br>Sub-Investigator |
| 1993 - 1994 | SHOCK (Early Revascularization versus Conservative Management in Cardiogenic Shock)<br>Sub-Investigator |
| 1991 - 1993 | ISIS-4 (Mononitrate, Captopril and Magnesium in Acute Myocardial Infarction)<br>Sub-Investigator |
| 1991 - 1993 | GUSTO (Streptokinase versus t-PA in Acute Myocardial Infarction)<br>Sub-Investigator |

## PUBLICATIONS

1.  Kjellgren O, Gomes JA.
    *Heart Rate Variability and Baroreflex Sensitivity in Myocardial Infarction.*
    American Heart Journal 1993;125(1):204-215.

2.  Gomes JA, Winters SL, Ip J, Tepper D, Kjellgren O.
    *Identification of Patients with High Risk of Arrhythmic Mortality. Role of Ambulatory Monitoring,
    Signal-Averaged ECG and Heart Rate Variability.*
    Cardiology Clinics 1993;11(1):55-63.

3.  Kjellgren O, Gomes JA.
    *The Role of Parasympathetic Modulation of the Reentrant Arrhythmic Substrate in the Genesis of
    Sustained Ventricular Tachycardia. (abstract)*
    PACE - Pacing & Clinical Electrophysiology 1993;16(4)II:879.

4.  Kjellgren O, Gomes JA.
    *Current Usefulness of The Signal-Averaged Electrocardiogram.  (monograph)*
    Current Problems in Cardiology 1993;18(6):361-420.

5.  Kjellgren O, Suh K, Gomes JA.
    *Vagal Tone is an Important Modulating Factor on The Reentrant Arrhythmic Substrate for the
    Genesis of Sustained Ventricular Tachycardia.  (abstract)*
    The Mount Sinai Journal of Medicine 1993;60(5):418.

6.  Gomes JA, Winters SL, Ip JH, Kjellgren O.
    *The Signal Averaged ECG in Patients with Sustained Ventricular Tachycardia in the Setting of
    Coronary Artery Disease.*
    In Gomes JA (ed): Signal-Averaged Electrocardiography; Concepts, Methods and Applications.
    Kluwer Academic Publishers 1993:311-326.

7.  Kjellgren O, Gomes JA.
    *Signal-Averaged Electrocardiography.*
    Cardiovascular Reviews & Reports 1994;15(2):59-70.

III

8.  Kjellgren O, Ip J, Suh K, Gomes JA.
    *The Role of Parasympathetic Modulation of The Reentrant Arrhythmic Substrate in the Genesis of Sustained Ventricular Tachycardia.*
    PACE - Pacing & Clinical Electrophysiology 1994;17(7):1276-1287.

9.  Kjellgren O, Wilentz JR, Kaganov L, Sherman W.
    *Prolonged Intracoronary Infusion of Streptokinase: An Alternative Pharmacologic Approach to Extensive Thrombus in Native Coronary Artery.*
    Catheterization and Cardiovascular Diagnosis 1994;33(1):90-94.

10. Anderson HV, Kirkeeide RL, Willerson JT, Mickkel DC, Kjellgren O, Smalling RW, Schroth G.
    *Coronary Artery Flow Monitoring Following Coronary Interventions.*
    European Heart Journal 1995;16(suppl. J):71-73.

11. Feld S, Kjellgren O, Smalling RW.
    *Aggressive Interventional Treatment of Acute Myocardial Infarction: Lessons from the Animal Laboratory Applied to the Catheterization Suite.*
    Cardiology 1995;86:365-373.

12. Kjellgren O, Feld S, Loyd D, Schroth G, Anderson HV, Smalling RW.
    *Successful Treatment of Chronic Total Peripheral Occlusions That Failed Conventional Techniques Using The Stiff Backend of The Glidewire*
    Catheterization and Cardiovascular Diagnosis 1995;36:360-363.

13. Feld S, Kjellgren O, Drtil A, Taus N, Sweeney MS, Teasmeyer H, Smalling RW.
    *Diffuse Vasospasm Following Stenting of a Free Gastroepiploic Artery Graft: Resolution with Balloon Angioplasty After Failure of Medical Therapy.*
    Catheterization and Cardiovascular Diagnosis 1995;36:352-355.

14. Feld S, Ganim M, Kelly R, Kjellgren O, Barasch E, Caroll E, Lachterman B, Taus N, Krishnaswami A, Kirkeeide R, Anderson HV, Schroth G, Smalling RW.
    *Predictive Value of Lesion Characteristics on Angioscopy and Intravascular Ultrasound on Acute and Long Term Outcome Following Coronary Interventions.* (abstract)
    Catheterization and Cardiovascular Diagnosis 1995;35(1):81.

15. Feld S, Ganim M, Vaughn WK, Kelly R, Kjellgren O, Caroll E, Taus N, Kirkeeide RL, Anderson HV, Schroth G, Smalling RW.
    *Utility of Angioscopy and Intravascular Ultrasound in Predicting Outcome Following Coronary Intervention.* (abstract)
    Circulation 1995;92(8)(suppl. I):I-18.

16. Hanna GP, Kjellgren O, Feld S, Fish CE, Schroth G, Anderson HV, Smalling RW.
    *Assessment and Follow-Up of Infrapopliteal Transcatheter Interventions in Diabetic Patients Referred for Amputation.* (abstract)
    Journal of the American College of Cardiology 1996;27(2)(suppl. A):191A.

17. Feld S, Ganim M, Caroll E, Kjellgren O, Kirkeeide R, Vaughn WK, Kelly R, McGhie AI, Kramer N, Loyd D, Anderson HV, Schroth G, Smalling RW.
    *A Comparison of Angioscopy, Intravascular Ultrasound and Quantitative Coronary Angiography in predicting Clinical Outcome Following Coronary Interventions in High-Risk Patients.*
    Submitted.

18. Kjellgren O, Motarjeme A, Feld S, Mickkel DC, Underwood C, Kirkeeide R, Smalling RW.
    *Rotational Atherectomy with a New Device: Initial Clinical Experience.*
    Catheterization and Cardiovascular Diagnosis 1996;37(4):459-466.

IV

# EXHIBIT 4



**In re MATTER OF LARRY HARVEY, JR.**

## CORROBORATING MEDICAL OPINION OF
## MICHAEL COOPERMAN, M.D.

My name is Michael Cooperman. I am a medical doctor specializing in Internal Medicine and Endocrinology, practicing primarily in Philadelphia, PA. I am duly and regularly engaged in the practice of my profession as an Internist and Endocrinologist. I received my medical degree from Albany Medical College, Albany, New York, in 1970. I am licensed to practice medicine in Pennsylvania, New York and Massachusetts. As an Internist and Endocrinologist, I have special health care knowledge and skill about the matter addressed below and for which I am providing opinions. I have never had a medical opinion disqualified by a court of law. My CV is attached to this Declaration for reference.

**Case Synopsis:**

On December 26, 1998 at about 4 PM in the afternoon, Larry Harvey, Jr., was found in his isolation cell, kneeling over his bed at the St. Johns County Detention Center, in St. Augustine, Florida. He was not breathing at the time and had no heartbeat. Resuscitation was started and Mr. Harvey's heart was eventually restarted, but he was found to have no brain activity.

**Primary Opinion:**

After a review of the materials referenced below, it is my opinion stated within a reasonable degree of medical probability that a reasonable basis exists to support a claim for medical malpractice with regards to the medical treatment provided to Larry Harvey, Jr., while he was incarcerated at the St. Johns County Detention Center, in St. Augustine, Florida, from late September through December 26th, 1998.

**Materials reviewed and relied upon:**

In forming these opinions, I have reviewed the medical records of Mr. Harvey's treatment while incarcerated at the St. Johns County Detention Center (SJCDC). I have also reviewed numerous transcripts of recorded statements taken from inmates who were present and observed Mr. Harvey to varying degrees throughout his incarceration from September 28th through December 26th. I have also reviewed Inmate Condition Check reports specific for Mr. Harvey, and the Office Notes of Dr. Stanley A. Cohen. I have reviewed several Affidavits from jail personnel and nursing staff who saw Mr. Harvey on the last day of his incarceration. I have reviewed the records from Flagler Hospital that document the condition of Mr. Harvey when he arrived on December 26th. I also have reviewed some background material on the adverse effects of medications such as those being administered to Mr. Harvey at the St. Johns County Detention Center, and I have

1

relied on my years of experience and training in medicine with regards to expected standards of care for patients such as Mr. Harvey.

**Factual Summary of Mr. Harvey's Treatment at SJCDC:**

The following is a factual summary based on a review of the materials referenced above. It is intended to provide a factual history of Mr. Harvey's treatment and condition leading up to his collapse on December 26th, 1998.

Initially, when Mr. Harvey came into the jail on or about September 28th, as indicated by the Medication Administration Records (MAR), Mr. Harvey was placed on Haldol 5 mg Elixir two times a day along with Cogentin .5 mg every morning and 2 mg at night. However, Mr. Harvey refused several doses of his medication on October 1st through October 3rd complaining that the medication made his heart hurt. Although he took his oral medications from October 3rd PM through October 6th AM, Dr. Stanley Cohen decided to change Mr. Harvey's Haldol from the 5 mg two times a day dose to Haldol Deconate 100mg IM injection per month. Haldol Deconate is a long acting slow release injection form of the medication and is discussed in more detail below. Mr. Harvey received the first dose of this long acting sustained release preparation on October 7th AM. However, his Cogentin medication was changed to PRN (as needed) dosing. After this change in Mr. Harvey's medication, Mr. Harvey began to experience marked sedation and extrapyramidal symptoms, as reported in a number of the witness statements, and as corroborated by the Inmate Progress Notes reporting a fainting incident on October 9th and chest pain. He was evaluated by Dr. Tessler on October 9th and placed on medical watch at that time.

An EKG conducted on October 14th indicated an abnormal change suggestive of inferior lateral left ventricular ischemia. Mr. Harvey's lethargy continued and on October 17th he was found unresponsive on the floor of his cell and "would" not speak or get up. On October 20th, Dr. Cohen changed his PRN Cogentin to 2 mg BID (twice a day) after a 2 mg IM dose was given immediately. (Note, Dr. Cohen's October 20th notes indicate that he was reducing the Haldol to 7.5 mg every night at bedtime, and increasing the Cogentin to 3 mg at bedtime. This notation is inconsistent with the MAR and Inmate Progress Notes for that date).

Mr. Harvey apparently improved some after his Cogentin was restarted on a scheduled basis although he was still experiencing significant extrapyramidal symptoms. On November 3rd Dr. Cohen saw Mr. Harvey and noted the extrapyramidal symptoms including choreiform tongue movements and lip tremors. Consequently, Dr. Cohen ordered the Haldol Deconate (long acting sustained release) injection dosing reduced to 75 mg IM per month starting on November 9th and continuing the Cogentin 2 mg orally two times a day. He also noted Mr. Harvey's inability to sleep and prescribed trazodone 75 every night (although this was not noted in his Office Notes). Although the Cohen prescription and the MAR indicated that the November 9th dose of Haldol Deconate was to be 75 mg, the Inmate Progress Notes indicate that 100 mg of the Deconate was given on November 9th.

2

Mr. Harvey endured the adverse effects and extrapyramidal symptoms up through November 20th when the records indicate that Mr. Harvey himself made a written request to have his medication adjusted, i.e., to receive a Cogentin injection, which seemed to help him before in October. He indicated, consistent with inmate witness accounts that he walked like a "zombie." There is no record found showing that Mr. Harvey received any adjustment of his Cogentin in response to his request for help.

According to Dr. Cohen's notes, he saw Mr. Harvey again on December 1, 1998. At that time, Dr. Cohen noted that the extrapyramidal symptoms were still present. Because Mr. Harvey complained about the effects of the Haldol Deconate (long acting injection preparation) and requested that he not be forced to take it, Dr. Cohen changed his Haldol Deconate to Haldol 10 mg tablets every night along with Cogentin 2 mg tablets twice a day and trazodone 75 mg every night. The Haldol 10 mg dose was begun on December 1st (20 days since his dose of 100 mg of Haldol Deconate as opposed to the 30 day interval originally ordered). By December 5th, Mr. Harvey, consistent with witness statements of his concern about his progression to a zombie like state, refused to take the PM dose of Cogentin, Haldol and trazodone. Although he took the medications the following evening (December 6th), as indicated by the MAR, Dr. Cohen was notified of his missed December 5th doses and called in an order to discontinue all of Mr. Harvey's medications. It is important to note that Mr. Harvey had received 5 doses of 10 mg Haldol in December and that the November 9th 100 mg injection of Haldol Deconate was still being released in Mr. Harvey's system. However, after the morning of December 7th, Mr. Harvey was not receiving any further Cogentin to counter the effects of the Haldol still in his system. He received no further additional medication until December 15th.

The Inmate Progress Notes for December 10th note that Mr. Harvey was found passed out on the floor of his cell. He was apparently moved to "Sick Cell" 27 4-A for observation late on December 10th. He was noted to have eaten very little of his breakfast on December 11th and was very unstable on his feet (see Inmate Condition Check report). Later on in the morning of December 11th he was moved back to isolation. On December 13th, it was noted that Mr. Harvey did not eat his lunch. By December 13th (as indicated by the Inmate Condition Check reports), it was noted that when he was released from his restraints temporarily, he was very unstable, falling backwards and almost hitting his head on the doorjamb. He was forced into a shower and consistent with witness statements pertaining to his incontinence, was given clean boxer shorts to put on afterward, before being placed back in his arm and leg restraints in his cell. He was noted at this time (10:50 PM on December 13th) to be very unresponsive.

Various notes in the record confirm that Mr. Harvey was not getting his meals. The December 14th Inmate Progress Notes indicate that Mr. Harvey did not eat his lunch (consistent with witness statements) and that he "refused to get up." On December 15th Dr. Tessler (based on the Progress Notes) apparently ordered Mr. Harvey to be moved to a "Sick Cell" for closer observation and to force fluids and place him on a soft diet. This

3

concern is consistent with the witness statements that Mr. Harvey was unable to eat or drink or take care of himself.

Dr. Cohen on December 15th, without the benefit of seeing Mr. Harvey, phoned in an order to restart Mr. Harvey's Haldol. However, rather than starting the medication back at a low dose, or even the dose previously given (10 mg per day), he ordered that the medication be given by intramuscular injection at a dose of 10 mg immediately and two times a day, a dose twice that of any previously recorded daily dosing for Mr. Harvey. Additionally, Dr. Cohen ordered an injection of Haldol Deconate 75 mg to be given immediately along with a 10 mg injection of Cogentin. The twice a day Cogentin 2 mg injections and Haldol 10 mg (2 per day) injections continued through December 22nd, at which time all medications were stopped, including any Cogentin that might counter act the adverse effects of the Haldol in Mr. Harvey's system. By December 22nd, Mr. Harvey had received a total of 15 injections of 10 mg of Haldol (150 mg) in addition to the 75 mg of the slow release Haldol Deconate, a total dose far exceeding doses that had previously resulted in significant adverse effects.

The progress notes for December 15th indicate the severity of Mr. Harvey's condition at the time his Haldol and Cogentin were restarted. Although he was taking some fluids at that time, the Progress Notes also indicate that he was having trouble eating, consistent with witness statements that he was unable to eat.

On December 16th, an EKG was performed and showed abnormalities suggestive of possible anterolateral ventricular ischemia and inferior ventricular ischemia. Mr. Harvey's heart rate was found to be markedly elevated consistently throughout December 15th and 16th as well. Additionally, the Progress Notes indicate that Mr. Harvey required assistance on December 17th to go to the toilet, and that he appeared weak.

On December 20th, Dr. Tessler referred Mr. Harvey to a cardiologist. However, the appointment was scheduled for January 5th, 1999. On December 20th, Mr. Harvey was moved back to his isolation cell (Block 15, cell 3A) for the last time. His Haldol daily injections stopped on December 22.

From December 22nd through December 26th, the records are practically void of any indication that Mr. Harvey was being medically monitored for adverse reactions to Haldol in his system. Yet witness statements indicate that he was suffering moderate to severe adverse effects during this time. The Inmate Condition Check reports for December 22nd and 23rd indicate that Mr. Harvey had made a request for medical attention, and that the medical staff was advised of his request. There is no indication in the available records that Mr. Harvey received any response to these documented requests for medical attention on December 22nd, 23rd, or 24th.

On December 25th, the Inmate Condition Check report indicates that Mr. Harvey's condition was so debilitated that he had to have assistance to lie down on his bed, after being given some milk. He had no breakfast. Mr. Harvey was given a single dose of Cogentin 2 mg IM on December 25th after nurse Amman observed him in a withdrawn

state, sweating, with hand retractions. The Progress Notes indicate that this provided Mr. Harvey some relief. He received no further treatment until he was found unresponsive the next day, when CPR was started.

The Inmate Condition Check reports for December 20th through December 26th indicated that Mr. Harvey showed virtually no activity at all, consistent with the Witness statements. He was merely seen laying on his bed almost the entire time from December 20th through December 26th until about 12:30 PM on December 26th. At that time he was observed kneeling over and beside his bed and on the floor and was found about 4 hours later in the same position, unconscious, and without respiration or pulse.

The witness statements I have reviewed provided further insight into the severe adverse effects the medications were having on Mr. Harvey. The witnesses consistently reported that Mr. Harvey experienced a steady decline especially in the month of December. Wendell Rogers described Mr. Harvey as steadily declining from the end of November from someone who was obviously on medication, but still somewhat coherent, to almost a vegetative state. Larry Calloway stated that when he first saw Larry Harvey in the second week of November, Mr. Harvey was still able to function for the most part up through the end of November. Then later when Mr. Calloway saw Larry in isolation on numerous occasions in December, he was shackled to his bunk and appeared non-responsive, showing no movement at any time.

Other witnesses described Mr. Harvey's earlier slow decline as early as October. Darren Williams described Mr. Harvey as being fine at the end of September or early October, but later on in the month, he noticed that on the basketball court, Mr. Harvey could not function or move like he normally would move. His movements were very slow and he exhibited emotionless facial expressions. He says that Mr. Harvey could talk at that time, but he could not make any quick movements. In December, Mr. Williams observed Mr. Harvey in a much more deteriorated condition. Mr. Williams stated that he observed medical personnel giving Mr. Harvey his injections even when he was unable to respond to them. He observed Mr. Harvey just laying on his bed and "shaking real bad." At that time, Mr. Williams observed that Mr. Harvey was so weak he could not resist when his injections were given. These observations correlate with the December 15th through December 22nd medication period. At one point, Mr. Williams saw the guards carrying Mr. Harvey back to the infirmary from his isolation cell, just days before his final collapse. He described how Mr. Harvey was obviously incontinent in his last weeks in isolation. He described how he could see and smell the defecation and urine on Mr. Harvey while Mr. Harvey was in isolation.

Mr. Williams also described how Mr. Harvey was unable to eat or drink on his own on many occasions when he observed him in the month of December in isolation. And Mr. Williams observed how Mr. Harvey appeared to be dehydrated and malnourished during the last days in isolation.

Other witnesses confirmed and corroborated these observations and provided additional evidence of other adverse drug effects from the Haldol. Some witnesses

observed Larry slobbering or drooling at the mouth, walking very slow and with a shuffling gait, matted eyes, zombie like, hollow eyed, motionless, shaking, staring into space (fixed stare), with significant weight loss, weakness to the point he could not walk, back muscle rigidity ("stiff as a two-by-four") and at times profuse sweating, slowed speech, mumbling, and non-responsiveness. Even the nursing staff and Correctional Officers confirmed Mr. Harvey's inability to verbally respond to their comments in the last days of his incarceration, stating that Mr. Harvey would not respond or would mumble incoherently. Other witnesses saw Larry fall while trying to walk, zombie like and shaking all over. Some witnesses described how Mr. Harvey was handcuffed with his left arm and leg against the wall, unable to move, and how the food tray was placed on his chest, yet because of weakness and severe shaking he was unable to eat or drink.

**Background Information on Haldol (haloperidol):**

The significant adverse effects of Haldol have been well documented for many years. According to the 1987 American Hospital Formulary Service, Drug Information 87, discussing phenothiazine medications, "the occurrence and severity of most extrapyramidal reactions are dose related, since they occur at relatively high dosages and disappear or become less severe following a reduction in dosage." Section 28:16.08. Dystonic reactions may include spasm of neck muscles, extensor rigidity of back muscles, difficulty swallowing or talking, perioral spasms, profuse sweating, pallor, and fever (although the drug may cause either increases or decreases in body temperature, due to their poikilothermic effect, interfering with temperature regulation in the hypothalamus). Additionally, in some cases insomnia is seen. Id.

Phenothiazine-induced parkinsonian signs and symptoms include mask-like facies, drooling or hypersalivation, tremors, pill-rolling motion of the fingers, cogwheel rigidity, postural abnormalities, shuffling gait, slow monotonous speech, dysphagia, and drowsiness. Id.

Cardiovascular effects: Hypotension, tachycardia, increased heart rate, syncope and dizziness have occurred in patients receiving phenothiazines, especially parenteral preparations. And ECG changes can occur that resemble quinidine-like alterations or those induced by hypokalemia, which has resulted in sudden death due to cardiac arrest. Because phenothiazines can suppress the cough reflex, aspiration of vomitus is a risk for those taking the drug. Id.

Acute toxicity: Generally, over dosage of phenothiazines may be expected to produce effects that are extensions of common adverse reactions; severe extrapyramidal reactions, hypotension, and sedation, tachycardia, ECG changes and cardiac arrhythmias, hypothermia, miosis, tremor, muscle twitching, spasm or rigidity, seizures, muscular hypotonia, dry mouth, difficulty in swallowing or breathing, cyanosis, and respiratory and/or vasomotor collapse, possibly with sudden apnea. With Haldol, coma with respiratory depression and hypotension (sometimes shock-like) may occur. Of course, manifestations of over dosage with Haldol Deconate injection may be prolonged. Id.

Because of these possibly severe adverse effects, and because dosage requirements for phenothiazines can vary over a wide rage, the dosage must be carefully adjusted to individual requirements and response, using the lowest possible effective dosage. Id.

It should also be noted that when giving Haldol Deconate, the peak blood levels of the drug occur in about 6-7 days, and has a half-life of about 3 weeks. Id. The principal disadvantage of long-acting parental antipsychotics such as Haldol is the inability to terminate the drug's action when severe adverse reactions occur. Id.

Extrapyramidal reactions are common with administration of Haldol, including marked drowsiness and lethargy, drooling or hypersalivation and fixed stare, and are generally dose related, but can usually be treated with medications such as Cogentin. Id. However, when concomitant therapy with medication such as Cogentin is necessary to manage Haldol induced extrapyramidal symptoms, it may be necessary to continue the Cogentin for a period of time after discontinuation of the Haldol in order to prevent the emergence of the symptoms. Id. This was not done in the present case. In fact, the Haldol Deconate continued to be released into Mr. Harvey's system after the Cogentin was stopped on December 22nd. The MAR indicates that Mr. Harvey was administered 75 mg of Haldol Deconate on December 15th, but also received additional Haldol injections (along with Cogentin injections) from December 15th up through December 22nd. Because of the significant risk associated with the use of Haldol, close clinical observation is required during dosage titration in order to minimize the risk of over dosage. Id.

## CONCLUSIONS:

These observations along with the records previously referenced clearly indicate significant and severe adverse effects from the medication that Mr. Harvey was prescribed and administered while incarcerated. It is clear that Mr. Harvey was in a severely sedated state and was suffering ongoing adverse reactions from the previous regimen of Haldol Deconate and the oral dosing from December 1st through December 7th. The Haldol adverse effects were further compounded by the absence of the Cogentin dosing that stopped on December 7th AM. When the medication was started back on December 15th, Mr. Harvey was still experiencing marked extrapyramidal effects consistent with Haldol toxicity. The 75 mg Haldol Deconate injection given on December 15th combined with the two times a day injections of 10 mg Haldol further compounded the problem. By the time the daily injections stopped on December 22nd, Mr. Harvey had accumulated significant amounts of Haldol. Consequently, after December 22nd, Mr. Harvey continued to experience increasing levels of the adverse effects of the Haldol, that were significantly enhanced due to the absence of any further Cogentin to counter some of the effects.

It is my opinion stated within a reasonable degree of medical probability that Mr. Harvey was suffering from Haldol toxicity and that the failure to adequately monitor and address the adverse effects of the Haldol was the direct cause of Mr. Harvey's

deteriorating mental and physical condition, shakiness and inability to eat or drink or care for himself. It is my further opinion stated within a reasonable degree of medical probability that Mr. Harvey's overmedication was the underlying cause for his cardiorespiratory arrest and subsequent hypoxic brain damage and vegetative state.

**Deviations from the Standard of Care:**

It is my further opinion, stated within a reasonable degree of medical probability that the prevailing professional standards of care were not met in this case in at least the following ways:

1. Failure on the part of Dr. Cohen and Dr. Tessler to adequately recognize, assess and address the significant adverse drug effects that resulted in Mr. Harvey's severe mental and physical deterioration.

2. Failure on the part of Dr. Cohen to properly dose and/or effectively assess the probable effect and risks of doubling the dose of Mr. Harvey's medication and failure to take precautions to closely monitor and address adverse effects of the medication when such a significant change in dosage took place.

3. Failure of nursing staff to properly monitor, observe and address significant drug toxicity and adverse reactions Mr. Harvey was experiencing and to provide supportive therapy accordingly.

4. Failure on the part of the administration of the medical department to have adequate procedures in place and/or implement those procedures to adequately address the situation where an inmate is obviously in significant distress from overmedication.

Again, it is my opinion stated to a reasonable degree of medical probability that a reasonable basis exists to support a claim for medical malpractice with regards to the medical treatment provided to Larry Harvey, Jr., while he was incarcerated at the St. John's County Detention Center from late September through December 26th of 1998. It is my opinion, stated within a reasonable degree of medical probability that Mr. Harvey's cardiorespiratory arrest and subsequent hypoxic brain damage and vegetative state was a direct result of the failures on the part of the medical caregivers to meet the prevailing professional standards of care listed above.

Under penalties of perjury, I declare that I have read the foregoing 8 pages and that the facts stated in it are true, dated this the __26__ day of March, 2001.

Michael Cooperman, M.D.

8

# CURRICULUM VITAE

Michael Cooperman, M.D.

| | | |
|---|---|---|
| Mailing Address | 921 West Cheltenham Ave.<br>Melrose Park, Pa 19027<br>635-2225  635 4902  FAX 635-2565 | |
| Education | Albany Medical College<br>Albany, New York | 1970 |
| | Rensselaer Polytechnic Inst<br>Troy, New York | · 1966 |
| Internship | Bronx Municipal Hospital<br>Albert Einstein Medical Center<br>Bronx, New York | 1970 |
| Residencies | Senior Medical Resident<br>Beth Israel Hospital<br>Boston, Mass | 1973 |
| | Endocrinology Fellowship<br>Beth Israel Hospital<br>Boston, Mass | 1972 |
| | Junior Medical Resident<br>Bronx Muncipal Hospital<br>Bronx, New York | 1971 |
| Academics | Clinical Assoc. Professor<br>Temple Univ School Med<br>Philadelphia, Pa. | 1985 |
| | Clinical Instructor<br>University of Texas<br>San Antonio, Texas | 1975 |
| | Clinical Fellow in Medicine<br>Harvard Medical School<br>Boston, Mass | 1973 |
| | Research Fellow in Medicine<br>Harvard Medical School<br>Boston, Mass | 1972 |

| | |
|---|---|
| Hospital Appts | Abington Memorial Hospital<br>Abington, Pa. |
| | Albert Einstein Medical Center<br>Philadelphia, Pa. |
| | Medical College of Pennsylvania<br>Elkins Park, Pa. |
| | Jeanes Hospital<br>Philadelphia, Pa. |
| | Fox Chase Cancer Center<br>Philadelphia, Pa |

Appointments     Chairman- Division of Endocrinology
           Jeanes Hospital

| | | |
|---|---|---|
| Military | U.S. Air Force    Wilford Hall Medical Ctr<br>San Antonio, Texas | 1974 |
| Certification | National Board of Med. Exam | 1971 |
| | American Board of Internal Med | 1974 |
| | Endocrinology and Metabolism | 1975 |
| | Fellow- American College of Endocrinology | 1994 |

| | |
|---|---|
| Licensure | Pennsylvania<br>New York<br>Massachusetts |
| Medical Societies | Alpha Omega Alpha<br>American College of Physicians<br>American Association of Clinical Endocrinologists<br>Endocrine Society |
| Publications | Cooperman,M.T.,Clinical Studies in<br>Alcoholic Ketoacidosis, Diabetes.<br>23:433,1974. |
| | Dorfman,S.G.,Cooperman,M.T.,et.al<br>Painless Thyroiditis and Transient<br>Hyperthyroidism Without Goiter,<br>Ann. Int. Med.,86:24,1977. |
| | Young,R.L.,Fuchs,R.,Woltzen,M., |

Cooperman,M.T.,Glucose Insulin Response
to Oral Glucose in a Healthy Obese
Population,Diabetes,28:208,1979.

Cooperman,M.T.,Adrenal Insufficiency,
Prognosis, Charles Press, 1981.

# EXHIBIT D

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Received by (Please Print Clearly) | B. Date of De

C. Signature

X _M Tessler_   3/29/0

☐ Agent
☐ Addr

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

1. Article Addressed to:

Dr. Michael Tessler
232 South Park Circle
St Augustine, Florida  32086

3. Service Type
☒ Certified Mail    ☐ Express Mail
☐ Registered       ☒ Return Receipt for Mercha
☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number (Copy from service label)
7000 0520 0017 9758 6591

PS Form 3811, July 1999          Domestic Return Receipt          102595-99-M-

UNITED STATES POSTAL SERVICE

First-Class Mail
Postage & Fees Pa
USPS
Permit No. G-10

● Sender: Please print your name, address, and ZIP+4 in this box ●

Cochran, Cherry, Givens & Smith, P.C.
ATTENTION:  Joseph D. Lane
Post Office Box 927
Dothan, Alabama  36302

SENDER: COMPLETE THIS SECTION

- Complete items 1, 2, and 9. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

A. Received by (Please Print Clearly)    B. Date of D
John R Amman    3-28-

C. Signature
X _John R Amman_    ☐ Agen
                     ☐ Add

D. Is delivery address different from item 1?    ☐ Yes
   If YES, enter delivery address below:    ☐ No

1. Article Addressed to:

John Richard Amman
10S Trier Lane
St Augustine, Florida   32095

3. Service Type
   ☒ Certified Mail   ☐ Express Mail
   ☐ Registered        ☒ Return Receipt for Merch
   ☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number (Copy from service label)
   7000 0520 0017 9758 6515

PS Form 3811, July 1999        Domestic Return Receipt        102595-99-1

UNITED STATES POSTAL SERVICE

First-Class Mail
Postage & Fees P
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4 in this box •

Cochran, Cherry, Givens & Smith, P.C.
ATTENTION:  Joseph D. Lane
Post Office Box 927
Dothan, Alabama   36302

SENDER: COMPLETE THIS SECTION

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

COMPLETE THIS SECTION ON DELIVERY

A. Received by (Please Print Clearly)   B. Date of Delivery

C. Signature

X _Jane Bland_   ☐ Agent
☐ Addressee

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

1. Article Addressed to:

Charlotte Ballard
6894 Pomar Road
St. Augustine, FL  32086

3. Service Type
☒ Certified Mail   ☐ Express Mail
☐ Registered   ☒ Return Receipt for Merch
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number (Copy from service label)

7000 0520 0017 9758 6522

PS Form 3811, July 1999   Domestic Return Receipt   102595-99-M-

UNITED STATES POSTAL SERVICE

First-Class Mail
Postage & Fees P
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4 in this box •

Cochran, Cherry, Givens & Smith, P.C.
ATTENTION:  Joseph D. Lane
Post Office Box 927
Dothan, Alabama  36302

36302+0927

SENDER: COMPLETE THIS SECTION

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Vicki Marie Mullins Lovett
227 Circle Drive East
St. Augustine, Florida  32095

**COMPLETE THIS SECTION ON DELIVERY**

A. Received by (Please Print Clearly)   B. Date of De

  Vicki Lovett                          3/28/0

C. Signature

X Vicki. Lo                            ☐ Agen
                                       ☐ Addre

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:         ☐ No

3. Service Type
☒ Certified Mail      ☐ Express Mail
☐ Registered          ☒ Return Receipt for Mercha
☐ Insured Mail        ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number (Copy from service label)
7000 0520 0017 9758 6539

PS Form 3811, July 1999          Domestic Return Receipt          102595-99-M-

UNITED STATES POSTAL SERVICE

First-Class Mail
Postage & Fees Pa
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4 in this box •

Cochran, Cherry, Givens & Smith, P.C.
ATTENTION:  Joseph D. Lane
Post Office Box 927
Dothan, Alabama  36302

| SENDER: *COMPLETE THIS SECTION* | *COMPLETE THIS SECTION ON DELIVERY* |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Received by (Please Print Clearly) JACK CARNES  B. Date of D 03-23<br><br>C. Signature<br>X *Jack Carnes*  ☐ Age<br>☐ Add |
| 1. Article Addressed to:<br><br>Nurse Karen A. Otis<br>St. Johns County Sheriff's Dept<br>4015 Lewis Speedway<br>St. Augustine, Florida  32095 | D. Is delivery address different from item 1?  ☐ Yes<br>If YES, enter delivery address below:  ☐ No<br><br>3. Service Type<br>☒ Certified Mail  ☐ Express Mail<br>☐ Registered  ☒ Return Receipt for Merch<br>☐ Insured Mail  ☐ C.O.D.<br>4. Restricted Delivery? (Extra Fee)  ☐ Yes |
| 2. Article Number (Copy from service label)<br>7000 0520 0017 9758 6553 | |

PS Form 3811, July 1999          Domestic Return Receipt          102595-99-

---

UNITED STATES POSTAL SERVICE

First-Class Mail
Postage & Fees Pa
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4 in this box •

Cochran, Cherry, Givens & Smith, P.C.
ATTENTION:  Joseph D. Lane
Post Office Box 927
Dothan, Alabama  36302

36302+0927

SENDER: COMPLETE THIS SECTION

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

COMPLETE THIS SECTION ON DELIVERY

A. Received by (Please Print Clearly)  Ann Warden Oy W.d.   B. Date of D
3/28/01

C. Signature
X    DOHNER    ☐ Agen
☐ Addr

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:        ☐ No

1. Article Addressed to:

Ann E. Dohner Warden
401 B. Street
St Augustine, Florida  32084

3. Service Type
☒ Certified Mail    ☐ Express Mail
☐ Registered        ☒ Return Receipt for Merch
☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number (Copy from service label)
7000 0520 0017 9758 6577

PS Form 3811, July 1999          Domestic Return Receipt          102595-99-M

---

UNITED STATES POSTAL SERVICE

First-Class Mail
Postage & Fees Pai
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4 in this box •

Cochran, Cherry, Givens & Smith, P.C.
ATTENTION:  Joseph D Lane
Post Office Box 927
Dothan, Alabama  36302

36302+0927    lalladladllaadlllalaadladlldadladldda

Page 113

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

A. Received by (Please Print Clearly) | B. Date of L
P. Sickis | 5/2

C. Signature
X | ☐ Age
| ☐ Add

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

1. Article Addressed to:

Dr. Stanley A. Cohen
Psychological Services
236 Southpark Circle East
St Augustine, FL  32086

3. Service Type
☒ Certified Mail   ☐ Express Mail
☐ Registered       ☒ Return Receipt for Merch
☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number (Copy from service label)
7000 0520 0017 9758 6584

PS Form 3811, July 1999          Domestic Return Receipt          102595-99-M

---

UNITED STATES POSTAL SERVICE

First-Class Mail
Postage & Fees P
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4 in this box •

Cochran, Cherry, Givens & Smith, P.C.
ATTENTION:  Joseph D. Lane
Post Office Box 927
Dothan, Alabama  36302

SENDER: COMPLETE THIS SECTION

■ Complete items 1, 2, and 3. Also complete
  item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse
  so that we can return the card to you.
■ Attach this card to the back of the mailpiece,
  or on the front if space permits.

A. Received by (Please Print Clearly) | B. Date of
JACK PARES | 03-28

C. Signature

X Jack Carver    ☐ Ag
                 ☐ Ad

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

1. Article Addressed to:

Nurse Carol Risden
St. Johns County Sheriff's Dept
4015 Lewis Speedway
St Augustine, Florida  32095

3. Service Type
   ☒ Certified Mail     ☐ Express Mail
   ☐ Registered         ☒ Return Receipt for Merch
   ☐ Insured Mail       ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)          ☐ Yes

2. Article Number (Copy from service label)
   7000 0520 0017 9758 6560

PS Form 3811, July 1999       Domestic Return Receipt       102595-99-M

UNITED STATES POSTAL SERVICE

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4 in this box •

Cochran, Cherry, Givens & Smith, P.C.
ATTENTION:  Joseph D. Lane
Post Office Box 927
Dothan, Alabama  36302

# EXHIBIT E

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

St. Johns County Sheriff's Dept
4015 Lewis Speedway
St Augustine, Florida  32095

*COMPLETE THIS SECTION ON DELIVERY*

A. Received by *(Please Print Clearly)*   B. Date of Delivery

C. Signature
X   ☐ Agent
    ☐ Addressee

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:   ☐ No

3. Service Type
   ☒ Certified Mail   ☐ Express Mail
   ☐ Registered   ☒ Return Receipt for Merchandise
   ☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? *(Extra Fee)*   ☐ Yes

2. Article Number *(Copy from service label)*
   7000 0520 0017 9758 6614

PS Form 3811, July 1999      Domestic Return Receipt      102595-99-M-1789

---

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only: No Insurance Coverage Provided)*

7000 0520 0017 9758 6614

| | |
|---|---|
| Postage | $ 2.02 |
| Certified Fee | 1.90 |
| Return Receipt Fee (Endorsement Required) | 1.50 |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $5.42 |

Postmark Here

Recipient's Name *(Please Print Clearly) (To be completed by mailer)*
St. Johns Co. Sheriffs Dept.
Street, Apt. No.; or PO Box No.
4015 Lewis Speedway
City, State, ZIP+4
St. Augustine FL 32095

PS Form 3800, February 2000      See Reverse for Instructions

EXHIBIT F

SENDER: COMPLETE THIS SECTION

■ Complete items 1, 2, and 3. Also complete
item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse
so that we can return the card to you.
■ Attach this card to the back of the mailpiece,
or on the front if space permits.

COMPLETE THIS SECTION ON DELIVERY

A. Received by (Please Print Clearly) | B. Da

C. Signature

X Sandra Pebecca

D. Is delivery address different from item 1?
If YES, enter delivery address below:

1. Article Addressed to:

St. Johns County Mental Hlth Dept
1955 U.S. 1 South
Suite C-2
St Augustine, Florida  32086

3. Service Type
☒ Certified Mail    ☐ Express Mail
☐ Registered        ☒ Return Receipt for
☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)

2. Article Number (Copy from service label)
7000 0520 0017 9758 6607

PS Form 3811, July 1999          Domestic Return Receipt          102!

UNITED STATES POSTAL SERVICE

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4 in this box •

Cochran, Cherry, Givens & Smith, P.C.
ATTENTION:  Joseph D. Lane
Post Office Box 927
Dothan, Alabama  36302